## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT HUMPHRIES, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MITSUBISHI CHEMICAL AMERICA, INC., MITSUBISHI CHEMICAL AMERICA EMPLOYEES' SAVINGS PLAN ADMINISTRATIVE COMMITTEE, KITTY ANTWINE and JANE AND/OR JOHN DOES 1 – 10,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Robert Humphries ("Plaintiff"), individually and as representative of a class of participants and beneficiaries of the Mitsubishi Chemical America Employees' Savings Plan (the "Plan"), brings this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§1001-1461 ("ERISA") against Plan sponsor, Mitsubishi Chemical America, Inc. ("Mitsubishi Chemical"), each member of the Board of Directors of Mitsubishi Chemical, the Plan's Administrative Committee ("Administrative Committee"), Kitty Antwine, who was the signatory to the Plan's annual Form 5500 filed under sections 104 and 4065 of ERISA and sections 6057(b) and 6058(a) of the Internal Revenue Code ("Form 5500"), and John/Jane Does 1-10 (collectively the "Defendants"), for breaching their fiduciary duties in the management, operation and administration of the Plan.

## INTRODUCTION

1.     Plaintiff is a participant in an ERISA defined contribution plan sponsored by his former employer, Mitsubishi Chemical. Today, 26 U.S.C. § 401(k) and § 403(b) defined

contribution plans, where employees bear the market risk and must pay the fees and expenses of the investment options, have become America's primary retirement system. Unlike defined-benefit pensions, which provide set payouts for life and where employer assumes the risks and pays the fees and expenses of the investment, 401(k) accounts rise and fall with financial markets, and therefore, the proliferation of 401(k) plans has exposed workers to big drops in the stock market and high fees from Wall Street money managers.[1] These retirement funds are significant to the welfare of the class. Plaintiff estimates that Defendants have caused losses of approximately $18 million and more to the Plan in total since 2017.

2.      The marketplace for services for defined contribution plans is established and competitive. Large plans, such as Mitsubishi Chemical's Plan, have the bargaining power to secure high quality, competitively priced administrative and investment management services. As ERISA fiduciaries to the Plan, Defendants are obligated to act for the *exclusive* benefit of participants and beneficiaries in ensuring that Plan expenses are reasonable. 29 U.S.C. § 1104(a)(1). These duties are the "highest known to the law," which must be performed with "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n. 8 (2d Cir. 1982); *Chao v. Hall Holding Co*., 285 F.3d 415, 426 (6th Cir. 2001). In discharging these duties, ERISA fiduciaries are held to the standard of financial experts in the field of investment management. *Pfeil v. State St. Bank & Trust Co*., 806 F.3d 377, 388 (6th Cir. 2015); see also *Katsaros v. Cody*, 744 F.2d 270, 275, 279 (2d Cir. 1984); *Liss v. Smith*, 991 F. Supp. 278, 296 (S.D.N.Y. 1998). The law is settled that ERISA fiduciaries have a duty to evaluate fees and expenses when selecting investments as well as a continuing duty to monitor fees and expenses of selected investments and remove imprudent ones. *Tibble v. Edison Int'l*,

---

[1]      Nancy Trejos, Retirement Wreck, Washington Post (Oct. 12, 2008), available at http://www.washingtonpost.com/wp-dyn/content/article/2008/10/11/AR2008101100177.html.

135 S. Ct. 1823, 1828 - 1829 (2015); 29 U.S.C. § 1104(a)(1)(A) (fiduciary duty includes "defraying reasonable expenses of administering the Plan"); 29 C.F.R. § 2250.404a-1(b)(i) (ERISA fiduciary must give "appropriate consideration to those facts and circumstances" that "are relevant to the particular investment.")

3.     In this case, the fiduciaries to the Plan failed to meet their fiduciary obligations in several basic ways. *First*, the Plan offered and maintained higher cost share classes when identical lower cost class shares of the same mutual funds were available. This resulted in the participants paying additional unnecessary operating expenses with no value to the participants and resulting in a loss of compounded returns. This is one of the most common and well-known example of an imprudent investment decision.[2] An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1). To do this prudently, a fiduciary must have a viable methodology for selecting and monitoring mutual fund share classes. For a large plan of approx. $700 million in net assets, such as this Plan, a fiduciary using a viable methodology will monitor the Plan's investment options continuously and to immediately take advantage of share class discounts as they become available. Information regarding share class discounts is made available to the public as part of the online EDGAR database maintained by the SEC. Defendants however failed to monitor the share classes of mutual fund investments and to substitute less expensive share classes of mutual funds from

---

[2]     The need to monitor share classes is so basic that the U.S. Security and Exchange Commission ("SEC") routinely audits SEC registered investment advisors to make sure that advisors take full advantage of all share class discounts available to their clients. *See* SEC Office of Compliance Inspections and Examinations ("OCIE"), "National Exam Program, Risk Alert," (July 13, 2016) ("OCIE Share Class Initiative"), available at https://www.sec.gov/files/ocie-risk-alert-2016-share-class-initiative.pdf ; *See also* FINRA 2016 Regulatory and Examination Priorities Letter, available at https://www.finra.org/sites/default/files/2016-regulatory-and-examination-priorities-letter.pdf.

more expensive share classes of the very same mutual fund, thus wasting the assets of the Plan participants. This could have been easily remedied only if the Defendants had a viable review process and methodology, which they neglected to keep and implement, violating their fiduciary duties.

4.      _Second_, Defendants wasted participants' money by failing to appropriately select and monitor the Plan's stable value fund. Substantially similar products were available from other providers that would have provided far higher returns to the Plan participants. Had Defendants monitored and evaluated the returns on the Plan's stable value fund, they would have realized that the Plan's stable value fund was an underperforming fund throughout the entire Class Period and that the Plan's parties in interest were benefitting from the returns on the stable value fund, at the cost of the Plan's participants.

5.      _Third_, Defendants failed to monitor the Plan's fees and expenses. As a result, the Plan kicked back payments to recordkeepers and other non-parties from the retirement savings of Mitsubishi Chemical's employees in excessive amounts.

6.      Pertinently, Plaintiff is not merely second-guessing Defendants' investment decisions with the benefit of hindsight. The information Defendants needed, to make informed and prudent decisions, was readily available to them when the decisions were made. Defendants however failed to make prudent decisions and breached their fiduciary obligations. Plaintiff, individually and as the representative of a putative class consisting of the Plan's participants and beneficiaries, brings this action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3) to enforce Defendants' liability under 29 U.S. C. §1109(a), to make good to the Plan all losses resulting from their breaches of fiduciary duties, and to restore to the Plan any lost profits.

Plaintiff also seeks such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

7.    Plaintiff brings this action pursuant to 29 U.S.C. §1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

8.    This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

9.    This District and Division are the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. §1391(b) because it is the district and division in which the subject Plan is administered, where at least one of the alleged breaches took place, or where at least one defendant may be found. The registered agent for the Plan's sponsor is also found in this district.

## PARTIES

### Plaintiff

10.    Plaintiff Humphries resides in Anderson, South Carolina and was an employee of Mitsubishi Chemical and a participant in the Plan under 29 U.S.C. § 1002(7) during the Class Period[3] because he and his beneficiaries were eligible to receive benefits under the Plan.

---

[3]    Under ERISA, claims for breach of fiduciary duty may be brought for "(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation . . . ." 29 U.S.C. § 1113. *See also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015) ("A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. In such a case, so long as the alleged breach of

**The Plan**

11.    The Plan was established on January 1st, 1994. Prior to April 1, 2017, the Plan name was the Mitsubishi Chemical Holdings America, Inc. Employees' Savings Plan. The Plan is a defined contribution plan, within the meaning of 29 U.S.C. § 1002(34), covering substantially all employees of Mitsubishi Chemical and affiliated employers that have adopted the plan, who have met the age and service requirements of the Plan. Throughout the Class period, the Plan had between 2873 and 4656 participants and between $376,728,654 and $700,368,614 in assets.

**Defendants**

12.    Defendant Mitsubishi Chemical, a Delaware corporation, maintains its place of business at 655 Third Avenue, 15th Floor, New York, NY 10017. The Plan's annual Form 5500 Reports filed during the Class Period identify Mitsubishi Chemical as the sponsor and "Plan Administrator" of the Plan.

13.    Per Form 5500 Reports filed during the Class Period, the Administrative Committee of the Plan also controls and manages the operation and administration of the Plan. Upon belief, the Board of the Directors of Mitsubishi Chemical appointed the Administrative Committee of the Plan. Defendant "Does" or the names of the individuals on the Board of Directors and the Administrative Committee during the relevant time period are unknown at this time and are named as "Jane/John Does" until the "Does" are known and can be named through amendment to this Complaint.

---

the continuing duty occurred within six years of suit, the claim is timely."). Accordingly, here, the Class Period begins six years before the date of the filing of this Complaint.

14.     Defendant Kitty Antwine is a signatory to the Form 5500 Reports filed during the Class Period. The Form 5500 Reports identify her as "name of individual signing as plan administrator."

15.     Defendants Mitsubishi Chemical, the Administrative Committee, the Board of Directors of Mitsubishi Chemical and Kitty Antwine are fiduciaries to the Plan under 29 U.S.C. §1002(21)(A)(i) and (iii) because they have sole authority to amend or terminate, in whole or part, the Plan, and have discretionary authority to control the operation, management and administration of the Plan, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available.

16.     Though not named as Defendants, certain service providers are fiduciaries to the Plan participants and are parties in interest in the matter. Prudential Trust Company serves as trustee of the Plan. Prudential Insurance Company of America and Prudential Retirement Insurance and Annuity Company serve as custodians to the Plan for certain investments. These entities are collectively referred to as "Prudential". Both the trustee and custodians hold the Plan's investment assets and execute investment transactions. UBS Financial Services Inc. was the Plan's financial consultant from the years 2017 until 2020, later replaced by Sageview Advisory Group, LLC in 2020. These entities are a "party-in-interest" to the Plan, whose services and compensation Defendants had a duty to monitor.

**DEFENDANTS' FIDUCIARY OBLIGATIONS**

17.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as Plan fiduciaries. The duties owed by an ERISA fiduciary to plan participants are the "highest

known to the law." *See Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982) (citing

Restatement (Second) of Trusts § 2 cmt. b (1959)). 29 U.S.C. §1104(a) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest
> of the participants and beneficiaries and – (A) for the exclusive purpose of (i)
> providing benefits to participants and their beneficiaries; and (ii) defraying
> reasonable expenses of administering the plan; [and] (B) with the care, skill,
> prudence, and diligence under the circumstances then prevailing that a prudent
> man acting in a like capacity and familiar with such matters would use in the
> conduct of an enterprise of like character and like aims.

18.    29 U.S.C. § 1104(a)(1)(C) further provides that a fiduciary shall discharge his

duties "by diversifying the investments of the plan so as to minimize the risk of large losses,

unless under the circumstances it is clearly prudent not to do so." Further, a fiduciary's duties

include a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison

Int'l*, 135 S. Ct. 1823, 1829 (2015).

19.    29 U.S.C. §1106(a)(1)(C) and 29 U.S.C. §1108(b)(2) and common law allows a

fiduciary of an employee benefit plan to enter into an agreement with a party in interest for the

provision of administrative services such as recordkeeping to the Plan "if no more than

reasonable compensation is paid therefor." Prudential is a "parties in interest" under 29 U.S.C.

§1106(a)(1)(C) and 29 USC § 1002(14).

20.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C.

§ 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach

by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in

relevant part, that:

> In addition to any liability which he may have under any other provision of this
> part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary
> responsibility of another fiduciary with respect to the same plan in the following
> circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

21.     29 U.S.C. § 1132(a)(2) and common law authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## DOCUMENTS RELIED UPON FOR THE COMPLAINT'S ALLEGATIONS

22.     Plaintiff has relied upon limited documents provided by Defendants, including disclosures under 29 CFR § 2550.404a-5 ("404a-5"), the Plan's Annual Form 5500 Reports filed during the Class Period (which are "Open to Public Inspection" and available for download from https://www.efast.dol.gov/5500Search/), other publicly available Form 5500 Reports, and mutual fund prospectuses available on SEC's EDGAR database.

## FACTUAL ALLEGATIONS

23.     In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts. Individual account value is determined solely by employee and employer contributions plus the amount gained through investment in the options made available in the plan, less fees and expenses. *See* 29 U.S.C. § 1002(34).

**A.**    **Defendants Caused the Plan Participants to Pay Excessive Fees and Lose Returns by Failing to Offer, Monitor, and Investigate Available Lower Cost Mutual Share Classes as Plan Investment Options**

24.    A mutual fund is a company that pools money from many investors and invests the money in securities such as stocks, bonds, and short-term debt. The combined holdings of the mutual fund are known as its portfolio. Investors buy shares in mutual funds and each share represents an investor's part ownership in the fund and the income it generates. Mutual funds make a profit by charging investors operating expenses, which are expressed as a percentage of the total assets in the fund. Operating expenses include fund management fees, marketing and distribution fees, administrative expenses and other costs.

25.    Shares of a single mutual fund may be offered in different "classes," corresponding to different shareholder rights and costs, such as different fee and "load" (i.e. sales) charges. Each class represents an identical interest in the mutual fund's portfolio. All share classes of mutual funds charge fees for the management of the assets of the fund. The cost may differ, but the investment product is identical - the managers, investment styles, and stocks are not merely similar, but identical. The principal difference between the classes is that the mutual fund will charge different marketing, distribution and service expenses depending on the class chosen. Generally, lower class shares are available to larger investors, such as 401(k) plans like the Plan since institutional investors make large fund share purchases, and higher-class shares are typically retail class shares which are available to a broader spectrum of investors. The Department of Labor has stated that "[i]nstitutional mutual funds typically charge lower expense ratios than do the retail funds with similar holdings and risk characteristics. One estimate is that the typical institutional fund has an expense ratio that is 50 basis points lower than comparable retail funds." U.S. Dep't of Labor Pension & Welfare Ben. Admin., *Study of 401(k) Plan Fees and Expenses* § 2.4.1.3 (Apr. 13, 1998).

26.     Defendants had access to these low-cost institutional share classes of mutual funds, as it could easily meet the minimum investment requirements. Instead of monitoring and taking advantage of volume discounts in purchasing mutual fund shares, Defendants instead offered higher cost mutual fund share classes as investment options for the Plan. Thus, the Plan fiduciaries wasted the assets of the Plan by failing to monitor the available share classes and to select the lowest share class of the funds for inclusion in the plan menu. This failure continued from the beginning of the class period until the present, in some cases. It was not until 2021 that Mitsubishi Chemical began correcting the share-class problem, by substituting lower-cost, identical share classes of these mutual funds.

27.     The following are instances, in which Defendants wasted money by failing to select the lowest-cost share class of the mutual fund as an investment option for the Plan:

28.     Defendants chose MFS Value Fund as an investment option available to participants in or prior to 2017. Defendants chose to invest in share class "A" in 2017 ("MEIAX"). As per the Plan's 404a-5 disclosures, as of March 31, 2017, the Plan's chosen share class "A" had the expense ratio of 0.86%. During the same year, other shares classes such as share class "R6" had an expense ratio of 0.49% by end of the year 2017.[4] This option was available to the Defendants and easily identifiable, as it was disclosed in the MFS Value Fund's annual prospectus. Defendants however continued to keep its investments in share class "A" in 2018, 2019 and 2020 which had a higher expense ratio between 0.84% to 0.82% during that time. In or around 2021, Defendants switched to share class R6, which then had a lower expense ratio of 0.45%, as ascertained from the Plan's 404a-5 disclosures as of October 31, 2022. This

---

[4]     *See* Form 497K, MFS Value Fund, Summary Prospectus (December 29, 2017), https://www.sec.gov/Archives/edgar/data/798244/000110465917075325/a17-22113_12497k.htm.

option was available to the Plan in 2017 itself. From the information available in the fund's publicly available prospectus, Defendants should have known of this option. Defendants however failed to fulfil their duties and kept their investments in share classes which had a higher cost to the Plan participants.

29.     Defendants chose Prudential Jennison Mid-Cap Growth Fund as an investment option available to participants in or prior to 2017. Defendants chose to invest in share class "Z" in 2017 ("PEGZX"). As per the Plan's 404a-5 disclosures, as of March 31, 2017, the Plan's chosen share class "Z" had the expense ratio of 0.76%. During the same time, another share class "Q" had an expense ratio of 0.58% as of end of the year 2017.[5] This option was available to Defendants and easily identifiable, as it was disclosed in the annual prospectus. Defendants however kept its investments in share class "Z" in 2018, which had a higher expense ratio, causing losses to the Plan participant. In or around 2019, Defendants removed Prudential Jennison Mid-Cap Growth Fund from the Plan.

30.     Defendants chose Pioneer Fundamental Growth Fund as an investment option available to participants in or prior to 2017. Defendants chose to invest in share class "Y" in 2017 ("FUNYX"). As per the Plan's 404a-5 disclosures, as of March 31, 2017, the Plan's chosen share class "Y" had the expense ratio of 0.79%. During the same time, another share class "K" had an expense ratio of 0.67% as of August 1, 2017.[6]  This option was available to the Defendants and easily identifiable, as it was disclosed in Pioneer Growth Fund's annual

---

[5]     See Form 497K, Prudential Jennison Mid-Cap Growth Fund, Summary Prospectus (December 27, 2017),
https://www.sec.gov/Archives/edgar/data/1022624/000006759017001480/jennisonmidcapgrowthsum497k.htm.
[6]     See Form 497K, Pioneer Fundamental Growth Fund, Summary Prospectus (August 1, 2017),
https://www.sec.gov/Archives/edgar/data/1174520/000117452017000013/fg080117summpro.htm.

prospectus. Defendants however continued to keep its investments in share class "Y" in 2018, 2019 and 2020 and kept paying a higher expense ratio of 0.77%. In or around 2021, Defendants removed this investment option from the Plan.

31.     Defendants chose Goldman Sachs Small Cap Value Fund as an investment option available to participants in or prior to 2017. Defendants chose to invest in share class "I" in 2017 ("GSSIX"). As per the Plan's 404a-5 disclosures, as of March 31, 2017, the Plan's chosen share class "I" had the expense ratio of 1.01%. During the same year, another share class "R6" had an expense ratio of 0.94% as of end of the year 2017.[7]  This option was available to Defendants and easily identifiable, as it was disclosed in the Goldman Sachs Small Cap Value Fund's annual prospectus. Defendants however continued to keep its investments in share class "I" in 2018, 2019 and 2020, which had a higher expense ratio of 0.97%. Defendants should have known of the lower-class option. Defendants failed to fulfil their duties and kept their investment in a share class which had a higher cost to the Plan participants. In or around 2021, Defendants removed the Goldman Sachs Small Cap Value Fund from the Plan.

32.     Defendants chose Janus Henderson Flexible Bond Fund as an investment option available to participants in or prior to 2017. Defendants chose to invest in share class "I" in 2017 ("JFLEX"). As per the Plan's 404a-5 disclosures, as of March 31, 2017, the Plan's chosen share class "I" had the expense ratio of 0.56%. During the same year, another share class "N" had an expense ratio of 0.45% as of October 2017.[8] This share class "N" had an expense ratio of 0.44%

---

[7]     *See* Form 497K, Goldman Sachs Small Cap Value Fund, Summary Prospectus (December 29, 2017),
https://www.sec.gov/Archives/edgar/data/822977/000119312517383208/d439223d497k.htm.
[8]     *See* Form 497K, Janus Henderson Flexible Bond Fund Summary Prospectus (October 27, 2017),
https://www.sec.gov/Archives/edgar/data/277751/000119312517321492/d407849d497k.htm.

as of October 2016.[9] This option was available to Defendants in 2017 and easily identifiable, as it was disclosed in the Janus Henderson Flexible Bond's annual prospectus. Defendants should have known of this option. Defendants however failed to fulfill their duties and kept their investments in a share class which had a higher cost to the Plan participants. In 2018, Defendants removed the Janus Henderson Flexible Bond Fund from the Plan.

33.    Defendants chose Virtus Duff & Phelps Real Estate Securities Fund as an investment option available to participants in or prior to 2017. Defendants chose to invest in share class "I" in 2017 ("PHRIX"). As per the Plan's 404a-5 disclosures, as of March 31, 2017, the Plan's chosen share class "I" had the expense ratio of 1.13%. During the same time, another share class "R6" had an expense ratio of 0.96% as of May 8, 2017.[10]  This option was available to Defendants and easily identifiable, as it was disclosed in Virtus Duff & Phelps Real Estate Securities Fund's annual prospectus. Defendants should have known of this option. Defendants however failed to fulfill their duties and kept their investments in a share class which had a higher cost to the Plan participants. In 2018, Defendants removed the Virtus Duff & Phelps Real Estate Securities Fund from the Plan.

34.    Defendants chose Pioneer Bond Fund as an investment option available to participants in or prior to 2017. Defendants chose to invest in share class "Y" in 2017 ("PICYX"). As per the Plan's 404a-5 disclosures, as of March 31, 2017, the Plan's chosen share class "Y" had the expense ratio of 0.59%. During the same time, another share class "K" had an

---

[9]    *See* Form 497K, Janus Henderson Flexible Bond Fund Summary Prospectus (October 28, 2016),
https://www.sec.gov/Archives/edgar/data/277751/000119312517193341/d394342d497k.htm.
[10]    See Form 497K, Virtus Duff & Phelps Real Estate Securities Fund, Summary Prospectus (May 8, 2017),
https://www.sec.gov/Archives/edgar/data/1005020/000157104917004632/t1701407.htm.

expense ratio of 0.47% as of November 2017.[11]  This option was available to Defendants and easily identifiable, as it was disclosed in Pioneer Bond Fund's annual prospectus. Defendants however continued to keep its investments in share class "Y" in 2018, 2019 and 2020 and continued to pay higher expense ratios of 0.59%, 0.47% and 0.46% respectively. During this time, share class "K" had an expense ratio of 0.35% as of November 2018[12], 0.34% as of November 2019[13] and November 2020.[14] Defendants should have known of these other options. Defendants however failed to fulfil their duties and kept their investments in a share class which had a higher cost to the Plan participants.

35.    Investing Plan assets in higher share classes harms the Plan's participants because it causes them to pay excess indirect fees which are not tethered to any service provided to Plan participants but rather are tied to the amounts invested by Plan participants. Because the Plan could have invested in identical mutual funds with a lower share class, Defendants' actions were directly erosive to the Plan's growth. Defendants this caused Plaintiff and other Plan participants/ beneficiaries harm by not just forcing them to pay higher fees, but also caused lost yield and returns as a result of those higher fees on the majority of investments offered through the Plan. The erosive effect of excessive fees and the resulting lost returns compounds over time substantially lowering the corpus of participants' retirement investments.

36.    In selecting share classes with a higher fee, Defendants demonstrated a lack of basic skill and prudence when selecting investments. A prudent fiduciary must have a viable

---

[11]    See Form 497K, Pioneer Bond Fund, Summary Prospectus (November 1, 2017), sec.gov/Archives/edgar/data/276776/000027677617000065/bfsummpro102717.htm.
[12]    See Form 497K, Pioneer Bond Fund, Summary Prospectus (November 1, 2018), sec.gov/Archives/edgar/data/276776/000027677618000095/bf110118summpro.htm.
[13]    See Form 497K, Pioneer Bond Fund, Summary Prospectus (November 1, 2019), sec.gov/Archives/edgar/data/276776/000027677619000071/bf110119summpro.htm.
[14]    See Form 497K, Pioneer Bond Fund, Summary Prospectus (November 1, 2020), sec.gov/Archives/edgar/data/276776/000027677620000216/bf102820summpro.htm.

methodology to monitor and select proper investment options and can easily spot the best share class options for the Plan. As stated by the SEC Office of Compliance Inspections and Examinations, a fiduciary investment advisor "has failed to uphold its fiduciary duty when it causes a client to purchase a more expensive share class of a fund when a less expensive class of that fund is available."[15]

37.     The Plan offered and maintained higher cost share classes when identical lower cost class shares of the same mutual funds were available.  Simply put, given the choice of two identical investments – with the same assets, investment style, and management – Defendants chose the more expensive product. Defendants thus caused Plan participants/beneficiaries harm by forcing them to pay higher fees and causing lost yield and returns they rely on for retirement income. In doing so, Defendants undermined the very purpose of the Plan to provide income security for participants/beneficiaries.

**B.     Defendants wasted participants' money because it failed to appropriately select and monitor the Plan's stable value fund**

38.     The single largest asset in the Plan was the Prudential Guaranteed Interest Account ("Prudential GIA"), a proprietary insurance general account product that is designed to provide liquidity and a stable rate of return, offered by Prudential. The Prudential GIA is a type of stable value fund. A prudent fiduciary, recognizing the importance of the fund in the Plan's investment lineup, would have taken great care in selecting and monitoring this investment option. Defendants did not.

39.     A stable value fund is a unique investment available only in ERISA defined contribution plans and certain other tax-advantaged plans.   A stable value fund is a conservative,

---

[15]     "OCIE's 2016 Share Class Initiative", National Exam Program Risk Alert, Securities and Exchange Commission, Office of Compliance Inspections and Examinations, July 13, 2016, available at https://www.sec.gov/ocie/announcement/ocie-risk-alert-2016-shareclass-initiative.pdf.

capital preservation investment product typically composed of high quality, low risk investments. It is designed to provide steady, positive returns and pay a contractually guaranteed return known as a "crediting rate." The crediting rate is set by the contract and may be reset at predetermined intervals.[16]

40.    The Prudential GIA was subject to the terms of an investment contract between Mitsubishi Chemical and Prudential. The crediting rate was set in advance by Prudential and reset quarterly, as provided in the contract. Prudential pooled the assets of the Prudential GIA fund with those of other, unaffiliated retirement plans and invested them. For its fee, Prudential kept the "spread," i.e., the difference between the crediting rate amounts Prudential paid to participants and the returns generated on the pooled assets.

41.    Defendants did not have a prudent process for selecting or monitoring the costs of the Prudential GIA. Substantially similar products were available from other providers that would have provided far higher returns to the Plan participants. For example, a prudent fiduciary would have compared the Prudential GIA to the stable value funds offered by Prudential's major competitors, the largest of which is TIAA Cref, which offered much better returns. The Plan fiduciaries had a duty to monitor the cost of the Prudential GIA. The Plan fiduciaries knew that Prudential would be compensated by the spread, the difference between the return to the participants and Prudential's earnings of the stable value fund paced in its general account. Illustratively, TIAA Cref offered better crediting rates, resulting in substantial losses during the proposed Class period, as set forth below:

---

[16]    See generally Stable Value Investment Association, Knowledge, https://stablevalue.org/knowledge (follow links for "Basics" and "Glossary").

| Period Range | Mitsubishi Chemical's stable value fund | TIAA Cref | Excess Spread Fees | Excess Spread Fees (in USD) |
|---|---|---|---|---|
| Mar-17 | 3.00% | 4.80% | 1.80% | 361,951 |
| Jun-17 | 3.00% | 4.80% | 1.80% | 376,273 |
| Sep-17 | 3.00% | 4.80% | 1.80% | 399,872 |
| Dec-17 | 3.00% | 4.80% | 1.80% | 367,804 |
| Mar-18 | 3.00% | 4.80% | 1.80% | 419,237 |
| Jun-18 | 3.00% | 4.80% | 1.80% | 470,670 |
| Sep-18 | 3.00% | 4.80% | 1.80% | 522,103 |
| Dec-18 | 3.00% | 4.80% | 1.80% | 573,536 |
| Mar-19 | 3.00% | 4.80% | 1.80% | 585,601 |
| Jun-19 | 3.00% | 4.80% | 1.80% | 597,666 |
| Sep-19 | 3.00% | 4.80% | 1.80% | 609,731 |
| Dec-19 | 3.00% | 4.80% | 1.80% | 621,796 |
| Mar-20 | 3.00% | 4.25% | 1.25% | 436,962 |
| Jun-20 | 3.00% | 4.25% | 1.25% | 442,121 |
| Sep-20 | 3.00% | 4.25% | 1.25% | 446,738 |
| Dec-20 | 3.00% | 4.25% | 1.25% | 452,439 |
| Mar-21 | 3.00% | 4.25% | 1.25% | 455,430 |
| Jun-21 | 3.00% | 4.25% | 1.25% | 458,421 |
| Sep-21 | 3.00% | 4.25% | 1.25% | 461,413 |
| Dec-21 | 3.00% | 4.25% | 1.25% | 464,404 |
| Mar-22 | 3.00% | 4.85% | 1.85% | 688,926 |

| Jun-22 | 3.00% | 6.10% | 3.10% | 1,157,111 |
| Sep-22 | 3.00% | 6.10% | 3.10% | 1,159,806 |
| Dec-22 | 3.00% | 6.60% | 3.60% | 1,350,938 |
| Mar-23 | 3.00% | 6.33% | 3.33% | 1,249,688 |
| Jun-23 | 3.00% | 6.33% | 3.33% | 1,249,688 |
| Total: | | | | **$16,380,321** |

42.    There were also other substantially similar options in the market that Defendants could have considered. Some of these options provided conservative returns, compared to TIAA-Cref, but even then, were significantly better than the Prudential GIA.  For instance, another substantially similar product i.e. the MassMutual stable value fund, would have also provided much higher returns than the Prudential GIA. A breakdown of these losses is provided below:

| Period Range | Mitsubishi Chemical's stable value fund | MassMutual rates | Excess Spread Fees | Excess Spread Fees (in USD) |
|---|---|---|---|---|
| Mar-17 | 3.00% | 3.91% | 0.91% | 182,986 |
| Jun-17 | 3.00% | 4.02% | 1.02% | 213,221 |
| Sep-17 | 3.00% | 3.96% | 0.96% | 213,265 |
| Dec-17 | 3.00% | 3.97% | 0.97% | 198,206 |
| Mar-18 | 3.00% | 4.22% | 1.22% | 284,150 |
| Jun-18 | 3.00% | 4.64% | 1.64% | 428,833 |
| Sep-18 | 3.00% | 4.68% | 1.68% | 487,296 |
| Dec-18 | 3.00% | 4.66% | 1.66% | 528,927 |
| Mar-19 | 3.00% | 4.66% | 1.66% | 540,054 |

| Jun-19 | 3.00% | 4.47% | 1.47% | 488,094 |
|--------|-------|-------|-------|---------|
| Sep-19 | 3.00% | 4.41% | 1.41% | 477,622 |
| Dec-19 | 3.00% | 4.55% | 1.55% | 535,435 |
| Mar-20 | 3.00% | 4.03% | 1.03% | 360,056 |
| Jun-20 | 3.00% | 4.03% | 1.03% | 364,307 |
| Sep-20 | 3.00% | 4.03% | 1.03% | 368,112 |
| Dec-20 | 3.00% | 4.03% | 1.03% | 372,809 |
| Mar-21 | 3.00% | 4.03% | 1.03% | 375,274 |
| Jun-21 | 3.00% | 4.03% | 1.03% | 377,739 |
| Sep-21 | 3.00% | 4.03% | 1.03% | 380,204 |
| Dec-21 | 3.00% | 4.03% | 1.03% | 382,669 |
| Mar-22 | 3.00% | 4.03% | 1.03% | 383,564 |
| Jun-22 | 3.00% | 4.03% | 1.03% | 384,460 |
| Sep-22 | 3.00% | 4.03% | 1.03% | 385,355 |
| Dec-22 | 3.00% | 4.03% | 1.03% | 386,250 |
| Mar-23 | 3.00% | 4.03% | 1.03% | 386,250 |
| Jun-23 | 3.00% | 4.03% | 1.03% | 386,250 |
| Total  |       |       |       | **$9,871,390** |

43.     The consequence of failing to monitor the cost of the stable value product was particularly significant here, where Prudential, the stable value provider, was also the recordkeeper to the Plan. General account stable value funds can be tremendously profitable for the issuing insurance company, because of the spread. The profit to Prudential and the

corresponding cost to the Plan should have been taken into account in selecting and setting Prudential's compensation as recordkeeper.

44.     Defendants did not have to scour the marketplace to find a better performing fund. The terms and rates of stable value funds are published and readily available. All it had to do was look. Defendants simply did not bother to find a better deal for the Plan participants. It therefore did not exercise even a minimal amount of due diligence.

45.     This breach of fiduciary duty alone resulted in a loss (before compounding) in excess of $16 million of participants' retirement savings (or at least $9 million if the other option is considered). This loss is something a competent, prudent, and diligent fiduciary would have known was happening in advance and would have been able to avoid. There is a crucial distinction in evaluating a stable value product's returns against investment returns available elsewhere, from the standpoint of how a fiduciary's choice is to be evaluated. The product's performance over the life of the product is guaranteed for a period at the outset. The plan fiduciary knows prior to the date the product is selected what the returns will be three months in advance.

46.     A stable value product is less sensitive to changes in interest rates than conventional bond funds. Stable value funds are just that: stable. A stable value product that performs well generally continues to perform well, in a stable manner. A stable value product that performs poorly, such as the fund selected by Defendants, generally continues to perform poorly, also in a stable manner. A prudent fiduciary would have known that the Prudential Guaranteed Interest Account would underperform and that, being a stable value product, it would continue to underperform. Defendants should not have selected the Prudential Guaranteed

Interest Account. Certainly, as it continued to underperform, Defendants should have removed and replaced it.

## C.    Defendants Failed to Monitor Excessive Administrative Fees

47.    Defendants have a duty to prudently select covered service providers. Courts that have considered the issue have made it clear that "the failure to exercise due care in selecting . . . a fund's service providers constitutes a breach of a trustees' fiduciary duty." 28 U.S.C. § 1108(b)(2) states services must be necessary for the plan's operation. Department of Labor guidance has also emphasized the importance of prudently selecting service providers.[17] The DOL has observed that:

> …the responsible plan fiduciary must engage in an objective process designed to elicit information necessary to assess the qualifications of the service provider, the quality of the work product, and the reasonableness of the fees charged in light of the services provided. In addition, such process should be designed to avoid self-dealing, conflicts of interest or other improper influence….

> Soliciting bids among service providers at the outset is a means by which the fiduciary can obtain the necessary information relevant to the decision-making process. Whether such a process is appropriate in subsequent years may depend, among other things, upon the fiduciary's knowledge of a service provider's work product, the cost and quality of services previously provided by the service provider, the fiduciary's knowledge of prevailing rates for the services, as well as the cost to the plan of conducting a particular selection process. Regardless of the method used, however, the fiduciary must be able to demonstrate compliance with ERISA's fiduciary standards.

48.    Administrative services are a necessary service for every defined contribution plan. The market for recordkeeping and administrative services is highly competitive. There are numerous recordkeepers in the marketplace capable of providing a high level of service to a large defined contribution plan like the Plan and will readily respond to a request for proposal.

---

[17]    DOL Info. Letter to Theodore Konshak (Dec. 1, 1997), available at https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/information-letters/12-01-1997.

These service providers primarily differentiate themselves based on price, and vigorously compete for business by offering the best price.

49.    The cost of administrative services services typically depends on the number of participants, not on the amount of assets in the participant's account. Thus, the cost of providing administrative services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account. Plans with large numbers of participants can take advantage of economies of scale: a plan with 15,000 participants can negotiate a much lower per participant fee for administrative services than a plan with 1,000 participants.

50.    When selecting a service provider or a recordkeeper, a fiduciary of a large plan like the Plan at issue, must solicit competitive bid proposals from several recordkeepers. The pan fiduciary should require the recordkeeper to identify, not only the administrative services and their cost, but also the cost of proprietary products – that is, investments offered by the recordkeeper or its affiliates – that the Plan must select.

51.    To monitor administrative costs, a prudent fiduciary must engage in a process called "benchmarking" to verify that the recordkeeper selected charges no more than reasonable fees. This involves, at the very least, comparing the cost of the proposed recordkeeper against the costs of the leading providers in the industry. Benchmarking is necessary both at the time a recordkeeper is selected, to verify the initial fees are reasonable, and at regular intervals thereafter. In evaluating the compensation of a recordkeeper, a plan fiduciary must consider the compensation of the recordkeeper from all sources, whether from direct payments, income from stable value funds, fees from separate accounts, revenue share from mutual funds, among other sources. To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, a prudent fiduciary of a large defined contribution plan

must also engage in a process of putting the plan's recordkeeping and administrative services out for competitive bidding at regular intervals of approximately three years and monitor administrative costs regularly within that period.

52.    In this case, based on information currently available to Plaintiff regarding the Plan's features, the nature of the administrative services provided by Prudential, the Plan's active participant level between 2197 to 3318 during the Class Period, and the market, the outside limit of a reasonable administrative fee for the Plan should have been no more than $70 per participant for the Class Period.[18] Here, Plan participants were paying excess fees in the range of $175 - $375. A summary of total losses suffered by the Plan participants is provided below:

| Year | Average Administrative expenses paid by the Plan per Active Plan participants (in USD) | Total Administrative expenses paid by the Plan | No. of Active Plan Participants by end of the Year i.e. [6a(2) participants] | Administrative expenses at $70 per Active Plan Participant | Loss suffered by the Plan |
|------|------|------|------|------|------|
| 2021 | 244.16 | 810,108 | 3318 | 232,260 | 577,848 |
| 2020 | 176.39 | 484,009 | 2744 | 192,080 | 291,929 |
| 2019 | 330.03 | 896,691 | 2717 | 190,190 | 706,501 |

---

[18]    *See*, 17th Annual NEPC Defined Contribution Plan Trends and Fees Survey for the year 2022 (March 2023), available at
https://www.nepc.com/wp-content/uploads/2023/03/2022-NEPC-DC-Plan-Trends-Fees-Survey-Results_Final.pdf; *See also* 16th Annual NEPC Defined Contribution Plan Trends and Fees Survey for the year 2021 (February 2022), available at
https://www.nepc.com/wp-content/uploads/2022/02/2021-NEPC-DC-Plan-Trends-and-Fee-Survey-Full-Results.pdf; 15th Annual NEPC Defined Contribution Plan Trends and Fees Survey for the year 2020, available at
NEPC-Horizontal-InvestorForce-Compatible.pptx (hubspotusercontent00.net);
14th Annual NEPC Defined Contribution Plan Trends and Fees Survey for the year 2029, available at
https://cdn2.hubspot.net/hubfs/2529352/2019%20DC%20Plan%20and%20Fee%20Survey%20(progress%20report)/2019%20NEPC%20DC%20Plan%20Progress%20Report.pdf.

| 2018 | 342.41 | 937,167 | 2737 | 191,590 | 745,577 |
| 2017 | 377.81 | 830,059 | 2197 | 153,790 | 676,269 |
| Total losses suffered by the Plan | | | | | $2,998,124 |

53.    Furthermore, another plan such as the Mitsubishi Electric U.S. Companies Retirement Plan, which is substantially similar to the Plan, paid total administrative fees of around $180,466 for the year ending 2021, with 3294 active participants, as seen on this plan's Form 5500 Report. For the entire Class Period, the average fees that Prudential received was at least 4 times more than the average paid by other substantially similar plans. A table showing the average expenses paid by similar plans is attached as Exhibit A.

54.    Defendants should have been aware of this potential for abuse and monitored for it. It failed to do that, and the participants suffered for it. Every dollar of unreasonable administrative fees cost participants a retirement dollar that was no longer available for investment.

## CLASS ACTION ALLEGATIONS

55.    ERISA authorizes any plan participant or beneficiary to bring an action individually on behalf of the plan for appropriate relief under 29 U.S.C. 1109(a) for a plan fiduciary's breach of duty, including all losses resulting from such breach and such other equitable or remedial relief the court may deem appropriate. See 29 U.S.C. § 1132(a)(2).

56.    Acting in this representative capacity, and as an alternative to numerous direct individual actions brought by participants on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiff seeks to certify a class action on behalf of participants and beneficiaries of the Plan. Plaintiff seeks to certify the following Class, and to be appointed as a representative ("Named Plaintiff") of the Class:

All participants in or beneficiaries of the MITSUBISHI CHEMICAL AMERICA EMPLOYEES' SAVINGS PLAN from six years prior to the filing of the complaint in this matter through the date of judgment, except the Defendants.

57.    This action meets the requirements of Fed. R. Civ. P. 23 and is certifiable as a class action for the following reasons:

a.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of December 31, 2021, the Plan had over 4656 participants with account balances.

b.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether Defendants are fiduciaries of the Plan;

- whether Defendants breached their fiduciary duty of prudence with respect to the Plan;

- whether Defendants had a duty to monitor other fiduciaries of the Plan;

- whether Defendants breached their duty to monitor other fiduciaries and parties of interest to the Plan; and

- the extent of damage sustained by Class members and the appropriate measure of damages

58.    Plaintiff's claims are typical of those of the Class because their claims arise from the same event, practice and/or course of conduct as other members of the Class. Plaintiff will

adequately protect the interests of the Class and has retained counsel experienced in class action litigation in general.

59.    Plaintiff has no interests that conflict with those of the Class.

60.    Defendants do not have any unique defenses against the Plaintiff that would interfere with his representation of the Class.

61.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**COUNT I**

**Breach of Fiduciary Duties**
**(Against All Defendants)**

62.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

63.    Mitsubishi Chemical failed to discharge its duties under 29 U.S.C. § 1104(a)(1)(A) and (B). It was obligated to discharge its duties to the Plan and its participants with the care, skill, prudence and diligence of a competent investment fiduciary charged with the responsibility for investing millions of dollars of retirement savings on behalf of thousands of investors.

64.    Common law and ERISA's duty of prudence required Defendants to give appropriate consideration to those facts and circumstances that, given the scope of its fiduciary investment duties, it knew or should have known were relevant to the particular investments of

the Plan and to act accordingly. *See* 29 C.F.R. § 2550.404a-1. The Supreme Court has concluded

that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones."

*Tibble*, 135 S. Ct. at 1828.

65.     As described above, Defendants failed to act prudently and in the best interest of

the Plan and its participants and breached its fiduciary duties in various ways. Specifically,

among other failings, Defendants (i) failed to investigate the availability of lower-cost share

classes of certain mutual funds; (ii) failed to prudently select and monitor the Plan's stable value

fund; and (iii) failed to delegate its duties prudently, including failing to have a credible basis to

conclude that the investment professionals responsible for carrying out its investment strategy

were competent to do so successfully, and failing to appropriately monitor and supervise their

performance.

66.     Defendants knowingly participated in each fiduciary breach of the other Plan

fiduciaries, knowing that such acts were a breach, and enabled the other Plan fiduciaries to

commit fiduciary breaches by failing to lawfully discharge their own duties. Defendants knew of

the fiduciary breaches of the other Plan fiduciaries and failed to make any reasonable and timely

effort under the circumstances to remedy the breaches. Accordingly, each defendant is also liable

for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

67.     Defendants are liable under 29 U.S.C. § 1109(a) to make good to the Plan any

losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, and for

such other equitable or remedial relief the Court deems appropriate. Total Plan losses will be

determined at trial after complete discovery in this case and are illustrated herein based upon the

limited information that has been available to Plan participants to date.

68.     As a direct and proximate result of these breaches, the Plan, Plaintiff and members of the Putative Class suffered substantial losses in the form of higher fees or lower returns on their investments than they would have otherwise experienced.

## COUNT II

### Breach of Fiduciary Duty to Monitor Excessive Fees
### (Against All Defendants)

69.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

70.     Mitsubishi Chemical was obligated to discharge its fiduciary duties solely in the interest of participants and for the exclusive purpose of defraying the reasonable expenses of administering the Plan. *See* 29 U.S.C. § 1104(a)(1)(A)(ii). In investing and managing the Plan's assets, Mitsubishi Chemical was permitted to incur only appropriate and reasonable costs.

71.     Mitsubishi Chemical failed to defray the Plan's administrative expenses as required and further failed to incur only appropriate and reasonable administrative expenses. As a result, the Plan's administrative expenses were excessive, resulting in losses to the Plan participants.

72.     Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of each of its co-fiduciaries under 29 U.S.C. § 1105(a).

73.     Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this

Count and is subject to other equitable or remedial relief as appropriate. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been made available to Plan participants to date

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

A.    Determine that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Find and declare that the Defendants breached their fiduciary duties as described above;

C.    Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

D.    Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

E.    Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good the Plan under §1109(a);

F.    Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;

G.    Award to Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

H.    Order the payment of interest to the extent it is allowed by law; and

I.      Grant other equitable or remedial relief as the Court deems appropriate.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury of all issues so triable by law.

Dated: July 19, 2023                          Respectfully submitted,

                                              POMERANTZ LLP

                                              */s/ Gustavo F. Bruckner*
                                              Gustavo F. Bruckner
                                              Samuel J. Adams
                                              Ankita Sangwan
                                              600 Third Avenue, 20th Floor
                                              New York, New York 10016
                                              Telephone: (212) 661-1100
                                              Facsimile: (917) 463-1044
                                              gfbruckner@pomlaw.com
                                              sjadams@pomlaw.com
                                              asangwan@pomlaw.com

                                              *Attorneys for Plaintiff*