UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT HUMPHRIES, individually and on
behalf of all others similarly situated,

                                  Plaintiff,

              -against-

MITSUBISHI CHEMICAL AMERICA, INC.
et al.,

                                  Defendants.

Case No. 1:23-cv-06214 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

Robert Humphries ("Plaintiff") brings this putative class action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, against his former employer Mitsubishi Chemical America, Inc. ("Mitsubishi Chemical"), each member of Mitsubishi Chemical's board of directors, the Administrative Committee of the Mitsubishi Chemical America Employees' Savings Plan (the "Administrative Committee"), Kitty Antwine, and John/Jane Does 1-10 (collectively, "Defendants"). *See* Dkt. 1 (the "Complaint" or "Compl."). He alleges that, with respect to the Mitsubishi Chemical America Employees' Savings Plan (the "Plan"), Defendants violated their fiduciary obligations under federal law by failing to monitor (1) share class discounts available to the Plan, (2) the Plan's stable value fund, and (3) the Plan's administrative fees and expenses. *See id.* ¶¶ 24-54, 65, 71.

Defendants have moved to dismiss Plaintiff's claims, Dkt. 14, contending that the complaint fails to state any valid causes of action and that Plaintiff lacks standing to bring the investment claims, *see* Dkt. 15 ("Br."). For the following reasons, Defendants' motion is GRANTED.

## BACKGROUND

I.    **Factual Background**[1]

The Plan is a defined-contribution benefit plan.  Compl. ¶ 11.  ERISA defines a defined-contribution plan as a:

> pension plan which provides for an individual account for each
> participant and for benefits based solely upon the amount
> contributed to the participant's account, and any income, expenses,
> gains and losses, and any forfeitures of accounts of other
> participants which may be allocated to such participant's account.

29 U.S.C. § 1002(34); *see Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 102 (2d Cir. 2021) ("Defined

contribution plans are retirement plans in which the employee contributes directly to her

individual account, and the benefits that will ultimately accrue to the employee are a function of

the amount she contributes to investments in the plan and the market performance of those

investments, minus the expenses of plan administration.").

Established in 1994, the Plan covers substantially all employees of Mitsubishi Chemical

(and of affiliated employers that have adopted the Plan) who meet the Plan's age and service

requirements.  Compl. ¶ 11.  During the Class Period – defined as July 19, 2017, to July 19,

2023, *see id.* ¶ 10 n.3 ("[T]he Class Period begins six years before the date of the filing of this

Complaint.") – the Plan had between 2,873 and 4,656 participants, and between $376,728,654

and $700,368,614 in assets, *id.* ¶ 11.  The Plan is sponsored by Mitsubishi Chemical, which

appointed an Administrative Committee to control and manage the Plan's operation and

administration.  *Id.* ¶¶ 12-13.  Plaintiff is a participant in the Plan.  *Id.* ¶¶ 1, 10.

During the Class Period, the Plan had several service providers.  For example, the

---

[1] Unless otherwise stated, the following facts are taken from the Complaint and assumed true for purposes of this motion.  *See New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 168 (2d Cir. 2023), *amended and superseded on reh'g on other grounds*, No. 20-1643-cv, 2023 WL 11965444 (2d Cir. Aug. 23, 2023).

Prudential Trust Company, Prudential Retirement Insurance and Annuity Company, and the Prudential Insurance Company of America (together, "Prudential") were the Plan's recordkeeper and trustee. *Id.* ¶¶ 16, 43; *see Hughes v. Nw. Univ.*, 595 U.S. 170, 174 (2022) ("Recordkeepers help plans track the balances of individual accounts, provide regular account statements, and offer informational and accessibility services to participants."). UBS Financial Services Inc. ("UBS") provided investment advice to the Plan as its financial consultant from 2017 to 2020, and UBS was later replaced by Sageview Advisory Group, LLC. Compl. ¶ 16.

The Court now summarizes Plaintiff's allegations as relevant to his three claimed breaches of Defendants' fiduciary duties.

### A. Mutual-Fund Share Classes

Plaintiff first takes issue with Defendants' monitoring of the mutual-fund share classes. Investors like the Plan can buy shares in mutual funds, which earn a profit by charging operating expenses – "expressed as a percentage of the total assets in the fund" – that "include fund management fees, marketing and distribution fees, administrative expenses[,] and other costs." *Id.* ¶ 24. Shares of a mutual fund are offered in different "classes," which "represent[] an identical interest in the mutual fund's portfolio" but "charge different marketing, distribution[,] and service expenses depending on the class chosen." *Id.* ¶ 25. "Retail" share classes, available to a broader spectrum of investors, are usually more expensive, while "institutional" share classes, available to "larger investors," are less expensive. *Id.*; *see Sacerdote*, 9 F.4th at 103 ("[A] 'retail' share (the share class that is marketed to individuals with small amounts to invest) typically has a higher expense ratio than an 'institutional' share (the share class that is available to institutional investors, including large retirement plans, with large amounts to invest) of the same fund.").

Because Defendants "could easily meet [mutual funds'] minimum investing requirements," they "had access to these low-cost institutional share classes." Compl. ¶ 26. Plaintiff alleges that "[i]nstead of monitoring and taking advantage of volume discounts in purchasing mutual fund shares, Defendants instead offered higher cost mutual fund share classes as investment options for the Plan." *Id.*

Plaintiff identifies seven mutual-fund investment options that Defendants could have chosen to obtain a cheaper share class of the same mutual fund, *id.* ¶¶ 27-34:

1. **MFS Value Fund:** Defendants invested in share class "A" (MEIAX), which, in 2017, had an expense ratio of 0.86%. *Id.* ¶ 28. That year, other share classes such as share class "R6" had an expense ratio of 0.49%. *Id.* Defendants kept their investments in share class A until 2021, when they switched to share class R6, which then had an expense ratio of 0.45%. *Id.*

2. **Prudential Jennison Mid-Cap Growth Fund:** Defendants invested in share class "Z" (PEGZX), which, in 2017, had an expense ratio of 0.76%. *Id.* ¶ 29. That year, share class "Q" had an expense ratio of 0.58%. *Id.* Defendants kept their investments in share class Z until 2019, when they removed the investment option from the Plan. *Id.*

3. **Pioneer Fundamental Growth Fund:** Defendants invested in share class "Y" (FUNYX), which, in 2017, had an expense ratio of 0.79%. *Id.* ¶ 30. That year, share class "K" had an expense ratio of 0.67%. *Id.* Defendants kept their investments in share class Y until 2021, when they removed the investment option from the Plan. *Id.*

4. **Goldman Sachs Small Cap Value Fund:** Defendants invested in share class "I" (GSSIX), which, in 2017, had an expense ratio of 1.01%. *Id.* ¶ 31. That year, share class "R6" had an expense ratio of 0.94%. *Id.* Defendants kept their investments in share class I until 2021, when they removed the investment option from the Plan. *Id.*

5. **Janus Henderson Flexible Bond Fund:** Defendants invested in share class "I" (JFLEX), which, in 2017, had an expense ratio of 0.56%. *Id.* ¶ 32. Share class "N" had an expense ratio of 0.44% in 2016 and 0.45% in 2017. *Id.* Defendants kept their investments in share class I until 2018, when they removed the investment option from the Plan. *Id.*

6. **Virtus Duff & Phelps Real Estate Securities Fund:** Defendants invested in share class "I" (PHRIX), which, in 2017, had an expense ratio of 1.13%. *Id.* ¶ 33. That year, share class "R6" had an expense ratio of 0.96%. *Id.* Defendants kept their investments in share class I until 2018, when they removed the investment option from the Plan. *Id.*

7. **Pioneer Bond Fund:** Defendants invested in share class "Y" (PICYX), which had an expense ratio of 0.59% in 2017 and 2018, 0.47% in 2019, and 0.46% in 2020. *Id.* ¶ 34. Share class "K" had an expense ratio of 0.47% in 2017, 0.35% in 2018, and 0.34% in 2019 and 2020. *Id.* Defendants kept their investments in share class Y from 2017 through 2020. *Id.*

## B. Stable Value Fund

Next Plaintiff asserts a claim related to the Plan's investment in a stable value fund. The Plan's "single largest asset" was the Prudential Guaranteed Interest Account (the "Prudential GIA"), a type of stable value fund "designed to provide liquidity and a stable rate of return." *Id.* ¶ 38. Available only in ERISA defined-contribution plans and certain other tax-advantaged plans, a stable value fund is "composed of high quality, low risk investments" and "designed to provide steady, positive returns." *Id.* ¶ 39. A stable value fund pays "a contractually guaranteed return known as a 'crediting rate,'" which is set by contract and "may be reset at predetermined intervals." *Id.* The Prudential GIA was subject to the terms of an investment contract between Mitsubishi Chemical and Prudential. *Id.* ¶ 40. "Prudential pooled the assets of the Prudential GIA fund with those of other, unaffiliated retirement plans and invested them." *Id.* For its fee, "Prudential kept the 'spread,'" that is, the "difference between the crediting rate amounts Prudential paid to participants and the return generated on the pooled assets." *Id.*

Prudential GIA offered a 3.00% crediting rate from March 2017 through June 2023. *See id.* ¶ 41. According to Plaintiff, "[s]ubstantially similar products were available from other providers that would have provided far higher returns to the Plan participants." *Id.* TIAA Cref, the "largest" of "Prudential's major competitors," offered a crediting rate of 4.80% from March 2017 to March 2020, 4.25% from March 2020 to March 2022, 4.85% from March to June 2022, 6.10% from June to December 2022, 6.60% from December 2022 to March 2023, and 6.33% from March to June 2023. *See id.* Plaintiff also alleges that the "MassMutual stable value fund"

offered a crediting rate between 3.91% and 4.68% from March 2017 to March 2020, and of 4.03% from March 2020 through June 2023.  *See id.* ¶ 42.

Given these "better performing fund[s]," *id.* ¶ 44, Plaintiff alleges that Defendants "should not have selected the Prudential [GIA]" and that they "should have removed and replaced it," "as it continued to underperform," *id.* ¶ 46.  Plaintiff also alleges that Defendants should have accounted for Prudential's profit from the "spread" of the Prudential GIA when "selecting and setting Prudential's compensation" as the Plan's recordkeeper.  *Id.* ¶ 43.

### C. Administrative Fees

Finally, Plaintiff alleges that "Defendants [f]ailed to [m]onitor" the Plan's "excessive administrative fees."  *Id.* at 22 (emphasis omitted).  From 2017 to 2021, "Plan participants were paying excess fees in the range of $175 - $375."  *Id.* ¶ 52.  In 2017, the Plan paid $830,059 in "[t]otal [a]dministrative expenses," or an average of $377.81 per "Active Plan [p]articipant[]."  *Id.*  In 2018, the Plan paid $937,167, averaging $342.41 per participant.  *Id.*  In 2019, the Plan paid $896,691, averaging $330.03 per participant.  *Id.*  In 2020, the Plan paid $484,009, averaging $176.39 per participant.  *Id.*  In 2021, the Plan paid $810,108, averaging $244.16 per participant.  *Id.*

Plaintiff alleges that these fees exceeded those of comparable plans.  Citing NEPC surveys, Plaintiff claims that "a reasonable administrative fee" for the Plan's size, features, and range of administrative services provided "should have been no more than $70 per participant for the Class Period."  *Id.*  Plaintiff also notes that the Mitsubishi Electric U.S. Companies Retirement Plan (the "Mitsubishi Electric Plan") paid total administrative fees of $180,466 for 2021, averaging $54.79 for each of its 3,294 active participants.  *See id.* ¶ 53.  Plaintiff further compares the Plan's expenses to those of other plans with 2,500 to 5,000 participants and $500 million to $800 million in assets under management in 2021, for which the administrative costs

per participant ranged from $33 to $75.  *See id.* (attaching to complaint a table "showing the average expenses paid by [33] similar plans"); Dkt. 1-1.

## II.    Procedural History

Plaintiff brought this action on July 19, 2023.  *See generally* Compl.  Defendants moved to dismiss the Complaint on October 2, 2023.  Dkts. 14, 15.  The motion is fully briefed.  *See* Dkts. 37 ("Opp."), 38 ("Reply").  On August 28, 2024, the parties appeared before the Court for oral argument on Defendants' motion.  Dkt. 48. ("Tr.").

At oral argument, Defendants asserted that Plaintiff lacked standing for his investment claims – an argument Defendants had raised in just a single sentence in their briefing papers.  Dkt. 15 at 23, Tr. at 30-33.  On September 9, 2024, the Court ordered the parties to submit supplemental briefing on whether Plaintiff had standing to bring his investment claims.  Dkt. 47.  On September 20, 2024, Defendants filed their supplemental memorandum of law on the standing issue, Dkt. 50, and on October 4, 2024, Plaintiff filed his response.  Dkt. 54.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021) (en banc) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The Court draws all reasonable inferences in the plaintiff's favor and accepts as true all nonconclusory allegations of fact.  *Id.*  However, a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully" and more than "facts that are 'merely consistent with' a defendant's liability."  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  Determining whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.

In considering a Rule 12(b)(6) motion to dismiss, "district courts 'may review only a narrow universe of materials,' which includes 'facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, matters of which judicial notice may be taken,' as well as 'documents not expressly incorporated by reference in the complaint that are nevertheless 'integral' to the complaint.'" *Clark v. Hanley*, 89 F.4th 78, 93 (2d Cir. 2023) (brackets and ellipses omitted) (quoting *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016)). "Where a document is referenced in a complaint, 'the documents control and this Court need not accept as true the allegations in the . . . complaint.'" *Tongue v. Sanofi*, 816 F.3d 199, 206 n.6 (2d Cir. 2016) (quoting *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000)).

Here, the Court takes judicial notice of the Plan's annual Form 5500 reports, along with other Form 5500 reports and disclosures under 29 C.F.R. § 2250.404a-5 ("404a-5 disclosures").[2] Each of the documents at issue is either incorporated by reference into Plaintiff's complaint or available from a source whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b); *see* Compl. ¶ 22 (describing these materials as "documents relied upon for the Complaint's allegations" (capitalization and emphasis omitted)).

## DISCUSSION

"To state a claim for breach of fiduciary duty under ERISA, a complaint must allege that (1) the defendant was a fiduciary who (2) was acting in a fiduciary capacity, and (3) breached his fiduciary duty." *Bloom v. AllianceBernstein L.P.*, No. 22-cv-10576 (LJL), 2024 WL 1255708, at

---

[2] "The Department of Labor . . . issued regulations requiring 401(k) plan service providers to file certain disclosures through an annual report called 'Form 5500.'" *Cunningham v. USI Ins. Servs., LLC*, No. 21-cv-01819 (NSR), 2022 WL 889164, at *3 n.1 (S.D.N.Y. Mar. 25, 2022) (quoting *Jacobs v. Verizon Commc'ns, Inc.*, No. 16-cv-01082 (PGG), 2017 WL 8809714, at *2 n.3 (S.D.N.Y. Sept. 28, 2017)); *see* 29 C.F.R. § 104a-5.

*4 (S.D.N.Y. Mar. 25, 2024) (brackets omitted) (quoting *Cunningham v. USI Ins. Servs., LLC*, No. 21-cv-01819 (NSR), 2022 WL 889164, at *2 (S.D.N.Y. Mar. 25, 2022)).  In addition to moving to dismiss claims against Kitty Antwine because she is not a fiduciary, Defendants primarily move to dismiss the complaint on the basis that they have not breached any fiduciary duty.  As a threshold issue, however, Defendants raise Plaintiff's lack of standing for his investment claims.

## I.    Standing

Article III standing is a requirement for this Court's jurisdiction.  *See, e.g.*, *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 64 (2d Cir. 2012) ("It is well established that 'a plaintiff must demonstrate standing for each claim [s]he seeks to press.'" (alteration in original) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006))); *In re Omnicom ERISA Lit.*, No. 20-cv-04141 (CM), 2021 WL 3292487, at *6-10 (S.D.N.Y. Aug. 2, 2021) (examining standing of participant in defined contribution plan to bring ERISA claims).

As noted above, Defendants argued in a single sentence in their moving papers that Plaintiff lacked "standing to pursue his investment claims" because he "does not allege that he invested in any of the investment options that he challenges."  Br. at 23.  At oral argument, Defendants reasserted this defense, stating that "with respect to standing on challenging particular investment funds, if a plaintiff has not invested in that fund, he or she has not been harmed by alleged imprudence with respect to that fund."  Tr. at 31:6-9.  At the Court's request, the parties subsequently submitted supplemental memoranda on the issue.  Dkts. 50, 54.  Having

considered both parties' arguments and legal authorities, the Court holds that Plaintiff lacks standing with respect to his share-class and stable value fund claims.[3]

To establish Article III standing, a "plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). A plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *TransUnion*, 594 U.S. at 426 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)).

As the Supreme Court has expressly stated, "[t]here is no ERISA exception to Article III." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 547 (2020). Plaintiffs cannot rely solely on the fact

---

[3] Defendants have not challenged Plaintiff's standing for his excessive-fees claim. Tr. at 31:4-11. However, "[s]tanding is a jurisdictional matter which must be resolved by the court; parties cannot either waive or confer standing by agreement." *In re Nasdaq Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 103 (S.D.N.Y. 1997). Here, all class participants, including Plaintiff, were subject to the Plan's administrative fees. Moreover, Plaintiff alleges that those fees depended not upon the amount of assets in a plan participant's account, but on the number of total participants within the Plan. Under the Plan, "the cost of providing administrative services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account." Compl. ¶ 49. Plaintiff has therefore sufficiently pled a concrete injury with respect to his claim for excessive recordkeeping fees. *See, e.g.*, *Bekker v. Neuberger Berman Grp. LLC*, No. 16-cv-06123 (LTS), 2018 WL 4636841, at *5 (S.D.N.Y. Sept. 27, 2018) (finding standing based on "assessment of allegedly improper fees"); *Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 156 (S.D.N.Y. 2017) (finding that plaintiffs personally suffered an injury in fact where plaintiffs alleged that they "personally paid excessive fees"); *Collins v. Ne. Grocery, Inc.*, No. 5:24-cv-00080, 2024 WL 3829636, at *7 (N.D.N.Y. Aug. 15, 2024) (finding a concrete injury where plaintiffs had "plausibly shown that direct fees were charged to every plan participant and as such, all plan participants' individual accounts suffered a financial loss").

that acts brought pursuant to ERISA are derivative and not direct actions to establish standing.

*Omnicom*, 2021 WL 3292487, at *10.  "[P]lan participants suing in a derivative capacity must

still satisfy Article III's individualized-injury requirement."  *Patterson v. Morgan Stanley*, No.

16-cv-06568 (RJS), 2019 WL 4934834, at *5 (S.D.N.Y. Oct. 7, 2019).  "To sue under ERISA, a

plaintiff must have both constitutional standing and a cause of action under ERISA."  *Antoine v.*

*Marsh & McLennan Cos., Inc*., No. 22-cv-06637 (JPC), 2023 WL 6386005, at *6 (S.D.N.Y.

Sept. 30, 2023) (citing *Thole*, 590 U.S. at 543-44)).  "Under *Thole*, the former requires a plaintiff

to allege a loss that affected his personal account or receipt of benefits due to him to ensure the

plaintiff has a 'concrete stake in th[e] dispute.'"  *Id.* (alteration in original) (quoting *Thole*, 590

U.S. at 547).

Relevant to the analysis herein, the Plan at issue is a "defined-contribution plan . . . in

which a plan participant's benefit is determined entirely by that participant's individual

contributions to their own plan and in which the participants direct the investment of their

contributions into various investment options offered by the plan."  *Singh v. Deloitte LLP*, 650 F.

Supp. 3d 259, 265 (S.D.N.Y. 2023).  "It follows, then, that a plan participant who does not invest

their plan assets into a particular fund offered in a defined-contribution plan will not have their

individual plan benefit affected in any way by that fund's performance or associated fees."  *Id*.

For that reason, district courts in this Circuit routinely hold that participants in defined-

contribution plans lack standing to bring claims challenging funds in which they did not

personally invest.  *See, e.g.*, *id.* at 265 ("[N]one of the plaintiffs have shown that the four

challenged funds in which they did not invest caused them any particularized injury, and

therefore lack standing to bring their claims against those four funds.");  *In re Omnicom*, 2021

WL 3292487, at *10 (plaintiffs "lack[ed] Article III standing to sue on behalf of injuries others

may have suffered" regarding funds "in which the named plaintiffs elected not to invest");
*Patterson,* 2019 WL 4934834, at *5 (in defined contribution plan, "[l]osses incurred by funds in which Plaintiffs did not invest cannot have impaired the value of Plaintiffs' individual accounts" and plaintiffs therefore "have not been injured as to those funds"); *Boyette v. Montefiore Med. Ctr.*, No. 22-cv-05280 (JGK), 2023 WL 7612391, at *4 (S.D.N.Y. Nov. 13, 2023) (holding that plaintiffs lacked Article III standing where "[n]either of the plaintiffs invested in any of the five funds for which the plaintiffs have alleged that there were available lower-cost share classes"); *In re UBS ERISA Litig.*, No. 08-cv-06696 (RJS), 2014 WL 4812387, at *7 (S.D.N.Y. Sept. 29, 2014) (holding that, where plan participants "made their own investment decisions about their individual accounts," Plaintiff was required to "allege that she did, in fact, suffer an individualized harm through her investment in [the challenged fund]").[4]

### A. Share-Class Claim

Plaintiff alleges that Defendants breached their duty of prudence by offering more expensive mutual-fund share classes when cheaper, identical share classes of the same fund were available as investment options for the Plan. *See* Compl. ¶¶ 24-37. Plaintiff supports his allegations with seven examples of mutual funds for which the Plan could have selected share classes with lower expense ratios. *Id.* ¶¶ 28-34. Plaintiff has not, however, alleged that he invested in any of those seven funds.

---

[4] In arguing otherwise, Plaintiff relies primarily on out-of-district cases, several of which pre-date *Thole*. That *Thole* addressed only defined-benefit plans and not defined-contribution plans does not alter the Court's analysis. *Thole* established that plaintiffs proceeding under ERISA could not rely solely upon the derivative nature of their claims to establish standing. *Thole*, 590 U.S. at 544. Courts in this district have since applied that reasoning to cases challenging defined contribution-plans, *see supra*, based on the structure of such plans.

Indeed, Plaintiff does not argue that the value of his individual accounts was impaired by the mismanagement of the mutual-fund share classes.  Rather, Plaintiff's theory of standing for his share-class claims assumes that he has standing for his stable value fund claim.  *See* Dkt. 54 at 2 ("Plaintiff . . . has Article III standing for all of his investment claims based on his indisputable standing to assert the stable value claims.").  Plaintiff alleges that, because the "GIA was imprudently selected as a result of the same deficient process that also resulted in the share class violations," Dkt. 54 at 1 (emphasis omitted), he has standing to bring his share-class claim as a representative for the putative class, *id.* at 1-2.  The Court need not address this argument, because, as set forth below, Plaintiff has not met his burden of establishing standing for his stable value fund claim.

To the extent Plaintiff argues that he has standing to bring the share-class claim in a representative capacity by virtue of his Article III standing for his *excessive-fees* claim, the Court likewise rejects that argument.  Plaintiff's theory of standing invokes the Second Circuit's test for "class standing," which requires (1) the plaintiff to show "actual injury" because of the defendant's illegal conduct; and (2) that "such conduct" implicate the "same set of concerns" as those of the rest of the putative class.  *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012).  Although Plaintiff's direct injury-in-fact arising from the payment of excessive fees would satisfy step one, Plaintiff's excessive-fees claim does not implicate the "same set of concerns" as the putative class's share-class claim.  *Id.* at 162.  The claims are superficially similar insofar as they raise, at a high level, similar questions regarding the monitoring of the Plan.  However, "the evidence that Plaintiffs will have to put forward to establish liability" will differ.  *Patterson*, 2019 WL 4934834, at *6 (rejecting theory of class standing in ERISA case where plaintiffs would need to "prove an entirely separate set of facts"

for claims involving different investment funds); *Antoine*, 2023 WL 6386005, at *8 (holding that plaintiffs lacked class standing to bring ERISA claims that implicated "different conduct and proof" than claims for which plaintiffs had a cognizable injury-in-fact).

Plaintiff's share-class claim is therefore dismissed without prejudice for a lack of standing.

### B.  Stable Value Fund

Plaintiff further alleges that Defendants breached their duty of prudence by failing to monitor the Plan's stable value fund.  As pleaded, the Complaint contains no facts as to whether Plaintiff personally invested in the Prudential GIA Fund.  At oral argument, Plaintiff's counsel made a cursory representation that Plaintiff had in fact invested in the Fund.  Tr. at 48:13-15 ("I can also represent on record that plaintiff did invest in the stable value fund claim.").  Counsel, however, provided no additional information from which the Court could infer that fact "by a preponderance."  *Martin v. United Bridge Cap., L.P.*, No. 21-1790-cv, 2022 WL 2166399, at *2 (2d Cir. 2022) ("Without specific factual allegations or submissions," plaintiff "failed to prove by a preponderance of the evidence that *he* had suffered an injury-in-fact sufficient for Article III standing.").  Plaintiff therefore has not offered sufficient information for the Court to infer an injury in fact flowing from his investment in the GIA Prudential Fund, "particularly in light of the absence of any facts pleaded in the . . . Complaint that would support such an inference."  *In re UBS*, 2014 WL 4812387, at *8 (evidence proffered for first time at oral argument insufficient to satisfy plaintiff's burden to establish standing).  Nor, for the reasons set forth above, is Plaintiff's Article III standing for his excessive-fees claim sufficient to allow Plaintiff to bring the stable value fund claim in a representative capacity.

Plaintiff's stable value fund claim is therefore likewise dismissed without prejudice.[5]

## II.    Breach of Fiduciary Claim for Excessive Fees

The Court therefore considers only the merits of Plaintiff's breach of fiduciary duty claim based on excessive fees at this time.

Fiduciaries under ERISA must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." *Id.* § 1104(a)(1)(A).  The statute imposes a "prudent man" standard, requiring a fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* § 1104(a)(1)(B).  "The prudence of a fiduciary 'is measured according to the objective prudent person standard developed in the common law of trusts.'"  *Sacerdote*, 9 F.4th at 107 (quoting *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984)).  "[U]nder trust law, a fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones."  *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015).

"Because the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts . . . the appropriate inquiry will necessarily be context specific." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014) (omission in original) (citation omitted) (quoting 29 U.S.C. § 1104(a)(1)(B)); *see Sacerdote*, 9 F.4th at 107 (noting that courts must exercise "particular care . . . in order to ensure that the complaint alleges nonconclusory

---

[5] The Court acknowledges that Defendants "do not contest that Plaintiff invested" in the Prudential GIA Fund during the class period.  Dkt. 50 at 1.  However, standing "must affirmatively appear in the record."  *Martin*, 2022 WL 2166399, at *2.

factual content raising a plausible inference of misconduct and does not rely on the vantage point

of hindsight" (brackets, ellipses, emphasis, and citation omitted)).  The issue at the motion-to-

dismiss stage is whether Plaintiff's "circumstantial factual allegations" permit the Court to

"reasonably 'infer from what is alleged that the process [of managing the Plan's fees] was

flawed.'"  *Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan

Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (quoting *Braden v. Wal-Mart Stores,

Inc.*, 588 F.3d 585, 596 (8th Cir. 2009)).  "In making that assessment, courts consider the

'particular services rendered by the recordkeeper, the fees of comparable plans and

recordkeepers at the time, and the bargaining power of the plan to negotiate competitive

recordkeeping fees.'"  *Gonzalez v. Northwell Health, Inc.*, 632 F. Supp. 3d 148, 165-66

(E.D.N.Y. 2022) (brackets and ellipses omitted) (quoting *Carrigan v. Xerox Corp.*, No. 3:21-cv-

01085 (SVN), 2022 WL 1137230, at *5 (D. Conn. Apr. 18, 2022)); *see Singh,* 650 F. Supp. 3d at

266 (S.D.N.Y. 2023) ("Well-reasoned decisions in this Circuit have found that plaintiffs must

plausibly allege that 'the administrative fees were excessive relative to the services rendered.'"

(quoting *Ferguson v. Ruane Cunniff & Goldfarb Inc.*, No. 17-cv-06685 (ALC), 2019 WL

4466714 (S.D.N.Y. Sept. 18, 2019)) (collecting cases).  Merely "paying higher-fees alone does

not allow the Court to conclude that the fees were 'excessive' enough to prove [the defendants']

imprudence."  *Ferguson*, 2019 WL 4466714, at *7.[6]

---

[6] The parties debate whether Plaintiff must plead that the Plan's administrative services are
excessive in relation to the specific services provided.  *Compare* Opp. at 17-18, *with* Reply at 1.
At least one court in this District has declined to impose that pleading requirement in this
context.  *See In re Omnicom*, 2021 WL 3292487, at *15 ("The overwhelming majority of judges
in this district do not require that a plaintiff allege why recordkeeping and administrative fees are
excessive in relation to the 'specific services' the Plan provided; and the trend in this district has
been to defer deciding whether certain funds are appropriate comparators until after discovery.").
*In re Omnicom*, however, cites no cases in support of this proposition and otherwise seems to
conflict with a nonprecedential Second Circuit decision requiring plaintiffs to "allege that the

As detailed above, Plaintiff alleges that, between 2017 and 2021, Defendants paid between $175 and $375 per participant for the Plan's administrative services.  Compl. ¶ 52.  In suggesting that these fees were excessive, Plaintiff essentially makes three comparisons: (1) industry surveys show that a "reasonable administrative fee for the Plan should have been no more than $70 per participant" for this period, *id.* ¶ 52 & n.18; (2) the "substantially similar" Mitsubishi Electric Plan averaged $54.79 in administrative fees per participant in 2021, *id.* ¶ 53; and (3) 32 other plans with similar numbers of participants and amounts of assets had administrative costs ranging from $33 to $75 per participant in 2021, Dkt. 1-1.

These comparisons fail upon closer inspection because Plaintiff provides no allegations about the administrative services that he purportedly compares.  In stating the Plan's administrative fees from 2017 to 2021, Plaintiff relies solely on the top-line amounts listed in Schedule H, Line 2(i)(5) of the Plan's Form 5500s.[7]  Absent from these totals, however, are any

---

fees were excessive relative 'to the services rendered.'"  *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (summary order) (quoting *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982)).  Some courts in this Circuit have suggested that *Young* does not apply in ERISA cases.  *See Carrigan*, 2022 WL 1137230, at *7-8 (noting that *Young*'s analysis relied on analogizing excessive-fees claims under ERISA to those under the Investment Company Act and reasoning from the Supreme Court's subsequent decision in *Jones v. Harris Associates L.P.*, 559 U.S. 335 (2010), that the ICA is a "different statutory scheme with a different purpose" that imposes different fiduciary duties than those owed under ERISA, *id.* at *8); *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 684 n.2 (D. Conn. 2018) ("*Young*, an unpublished decision, never explicitly adopts the ICA standard.").  Those decisions, however, are "merely persuasive, not controlling."  *Cunningham*, 2023 WL 8603123, at *5 n.2 (acknowledging *Carrigan*).  The Court is "persuaded by the Second Circuit's decision in *Young*" and follows other courts in this District by applying it to claims in the ERISA context.  *Id.*; *see Singh*, 650 F. Supp. 3d at 266-67 (applying *Young*'s standard); *Boyette*, 2023 WL 7612391, at *6 (same); *Gonzalez*, 632 F. Supp. 3d at 167 (same); *Cunningham*, 2022 WL 889164, at *4 (same); *Ferguson*, 2019 WL 4466714, at *7-8 (same).

[7] As Plaintiff notes, the Plan's annual Form 5500s are "Open to Public Inspection" and available for download from the U.S. Department of Labor's EFAST system.  Compl. ¶ 22; *see* U.S. Dep't of Labor, *Form 5500 Search*, https://www.efast.dol.gov/5500Search.

specifics about the administrative services provided to the Plan. The omission is significant because administrative services can vary greatly among different plans. The Plan's 2017 Form 5500 indicates, for example, that the Plan's administrative services included "recordkeeping services[,] . . . investment advisory services, legal services, audit fees[,] and general consulting services." Dkt. 16-2 at 37. The Plan received similar services in 2021. *See* Dkt. 16-3 at 45 (noting that the Plan paid $392,455 for administrative services and $417,653 for "advisory, legal, audit, and general consulting services" in 2021). Plaintiff alleges that "[t]here are numerous recordkeepers in the marketplace capable of providing a high level of service to a large defined contribution plan like the Plan," Compl. ¶ 48, and that the cost of administrative services "typically depends on the number of participants" in the plan, *id.* ¶ 49. But his suggestion "that all recordkeepers offer the same range of services does not mean that all plans . . . receive an identical subset of services within that range." *Singh*, 650 F. Supp. 3d at 267.

Plaintiff's comparators similarly lack details as to the administrative services behind the numbers cited. Mitsubishi Electric's total administrative expenses in 2021 of $180,466 included a $124,014 payment to its investment advisor, Dkt. 16-1 at 22, but Plaintiff provides no other details as to how its administrative services stack up against those received by the Plan, *see* Compl. ¶ 53. Insofar as the Plan's total administrative fees exceeded Mitsubishi Electric's for a given year, the comparison is an empty one without further insight into the services provided to those plans. Because Plaintiff does not state whether the allegedly cheaper plan offered the same services – or provide sufficient factual matter to suggest that the services provided were similar – the Court cannot reasonably draw an inference that the Plan's fees were unreasonable. *See Boyette*, 2023 WL 7612391, at *6 (dismissing recordkeeping claim where the plaintiffs "failed to allege with specificity what recordkeeping services the Plan received, [or] plead that the services

provided by the recordkeepers for the comparator plans were the same as those provided by the Plan's recordkeepers").

Plaintiff's comparison to the figures in the NEPC surveys fails for substantially the same reasons. *See* Compl. ¶ 52 n.18. The 2021 NEPC survey, for example, suggests only that most plans with 1,000 to 5,000 participants paid roughly $50 to $80 per participant in "record keeping, trust and custody costs" in 2021. NEPC, *NEPC 2021 Defined Contribution Plan Trends and Fee Survey Results* 12 (Feb. 2022), https://www.nepc.com/wp-content/uploads/2022/02/2021-NEPC-DC-Plan-Trends-and-Fee-Survey-Full-Results.pdf [https://perma.cc/XA9Q-MTNS]. Such costs, however, are only a subset of the full range of administrative services available to a plan. As the 2019 NEPC survey acknowledges, "[h]igher (or lower) record keeping fees are a function of plan size and complexity, and the package of services the plan sponsor has contracted for." NEPC, *NEPC 2019 Defined Contribution Progress Report* 10 (2019), https://cdn2.hubspot.net/hubfs/2529352/2019%20DC%20Plan%20and%20Fee%20Survey%20(progress%20report)/2019%20NEPC%20DC%20Plan%20Progress%20Report.pdf [https://perma.cc/7KJT-EGL6].

By suggesting from these surveys that "the outside limit of a reasonable administrative fee for the Plan should have been no more than $70 per participant for the Class Period," Plaintiff draws a false equivalency between recordkeeping costs and administrative fees. Compl. ¶ 52. Plaintiff responds that even smaller plans with fewer participants were paying "between $50 - $110 per participant in 2019" and "around $50 - $160 in 2022." Opp. at 20. Yet "that statistic provides little insight into whether *total* recordkeeping fees . . . paid by smaller-plan participants are higher or lower than the *total* recordkeeping fees paid by plaintiff and other Plan participants." *Gonzalez*, 632 F. Supp. 3d at 166. "Without a sufficient allegation that the *total* fees paid by Plan participants are higher or lower than the *total* fees paid by a smaller

comparator, plaintiff has failed to plausibly allege that defendants breached their fiduciary duties by allowing the" alleged administrative fees. *Id.*

Finally, Plaintiff's table collecting the 2021 administrative services of 33 plans is equally flawed as a comparator. *See* Dkt. 1-1 at 2 ($33 to $75 per participant in 2021 across 33 plans). Plaintiff alleges that "the average fees that Prudential received was at least 4 times more than the average paid by other substantially similar plans." Compl. ¶ 53. Plaintiff appears to conflate the "fees that Prudential received" as the Plan's recordkeeper – a subset of the Plan's overall administrative fees – with the total fees paid. *Id.* In any event, without describing the "basket of services" provided to each plan, Plaintiff's exercise is an apples-to-apples comparison in name only. *Cunningham*, 2022 WL 889164, at *4; *see Singh*, 650 F. Supp. 3d at 267 ("Because the plaintiffs' comparison does not compare apples to apples, the comparison fails to indicate plausibly imprudence on the part of the defendants.").

Contrary to Plaintiff's suggestion, his cited cases denying motions to dismiss excessive-fees claims did not present "similar allegations." Opp. at 16; *see id.* at 16-17 (citing *Ruilova v. Yale-New Haven Hosp., Inc.*, No. 22-cv-00111 (MPS), 2023 WL 2301962, at *16 (D. Conn. Mar. 1, 2023); *Carrigan*, 2022 WL 1137230, at *5-7; *In re Omnicom*, 2021 WL 3292487, at *15). *Carrigan* and *Ruilova* presented recordkeeping allegations – as opposed to those involving administrative services writ large – with much stronger connections between the services provided to the plaintiffs' plan and its comparators. *See Carrigan*, 2022 WL 1137230, at *6 (plaintiffs alleged that "other recordkeepers . . . were available to provide comparable [recordkeeping] services at [lower] costs" and that "various plans of comparable size . . . in fact paid [those lower] annual recordkeeping fees"); *Ruilova*, 2023 WL 2301962, at *17 (noting that plaintiffs "provide information about nine similarly sized plans, all of which received at least the

20

same [recordkeeping] services as the Plan yet paid a substantially lower per participant

[recordkeeping] fee" (quotation marks omitted)). *In re Omnicom* similarly involved an

allegation that the recordkeeper of the plaintiffs' plan, Fidelity, "charges a much lower rate to

other, more comparable plans." 2021 WL 3292487, at *15.[8] For these reasons, Defendants'

motion to dismiss Plaintiff's excessive-fees claim is granted.

## III.    Kitty Antwine

Defendants also move to dismiss Kitty Antwine as a defendant. Br. at 23-25. During the

Class Period, Antwine was a signatory to the Plan's Form 5500 reports, which identified her as

the "individual signing as plan administrator." Compl. ¶ 14; *see* Dkts. 16-2 at 2, 16-3 at 2.

Defendants contend that signing the Plan's Form 5500 is not sufficient to show that Antwine

served as a Plan fiduciary. Br. at 24. The Court agrees.

Under ERISA, "a person is a fiduciary with respect to a plan to the extent" she "exercises

any discretionary authority or discretionary control respecting management of such plan or

exercises any authority or control respecting management or disposition of its assets," or to the

extent she "has any discretionary authority or discretionary responsibility in the administration of

such plan." 29 U.S.C. § 1002(21)(A). Thus, fiduciary status is imposed both on those "who

---

[8] Whether the Court could plausibly infer that the Plan's *recordkeeping* costs were excessive from allegations that those costs exceed the total *administrative* fees of the Plan's comparators (which include recordkeeping costs) is a question, albeit not one addressed by the parties. *Compare, e.g.*, Dkt. 16-3 at 45 ($118.28 in the Plan's recordkeeping costs per participant in 2021), *with* Compl. ¶ 53 (total administrative costs of $54.79 per participant for the Mitsubishi Electric Plan in 2021); Dkt. 1-1 at 2 ($33 to $75 per participant in 2021 across 33 plans); *see In re Omnicom*, 2021 WL 3292487, at *15 (plaintiff plausibly alleged recordkeeping claim by, among other things, comparing $34 per-participant recordkeeping cost to $35 per-participant cost of "*all* administrative fees (recordkeeping plus additional administrative fees)"). Plaintiff does not pursue a recordkeeping claim in his Complaint; he alleges only that "the Plan's *administrative* expenses were excessive." Compl. ¶ 71 (emphasis added); *id.* at 22 ("Defendants Failed to Monitor Excessive Administrative Fees"). Indeed, the parties' briefs focused only on Plaintiff's comparison of administrative fees to administrative fees and did not present specifics on the Plan's recordkeeping costs. *See generally* Br.; Opp.; Reply.

have actually been granted discretionary authority, regardless of whether such authority is ever exercised" and on "those who exercise discretionary authority, regardless of whether such authority was ever granted." *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 63 (2d Cir. 2006) (quoting *Olson v. E.F. Hutton & Co., Inc.*, 957 F.2d 622, 625 (8th Cir. 1992)).

As to Kitty Antwine, Plaintiff alleges only that she signed the Plan's Form 5500s on the line designated for plan administrators. Compl. ¶ 14. This allegation does not, without more, suggest that Antwine exercised discretionary authority or was authorized to exercise discretionary authority with respect to the Plan. *See Luense v. Konica Minolta Bus. Sols. U.S.A., Inc.*, 541 F. Supp. 3d 496, 508-09 (D.N.J. 2021) (defendant listed as the plan's administrator did not retain fiduciary duties that it delegated to the plan committee). While the "formal title of 'Plan Administrator' has special significance under ERISA[,] . . . [o]ther courts have found that the title 'Plan Administrator' does not automatically make a third-party administrator a fiduciary if it has no discretionary authority." *Bouboulis*, 442 F.3d at 65 (citing *Baker v. Big Star Div. of the Grand Union Co.*, 893 F.2d 288, 290 (11th Cir. 1989)). In the case cited by Plaintiff, the plaintiffs sued individuals who had signed the plans' Form 5500s as the Plan Administrator; however, the plaintiffs also alleged that these individuals "exercised discretionary authority with respect to the management and administration of the Plans and their assets." *Cress v. Wilson*, No. 06-cv-02717 (JGK), 2007 WL 1686687, at *2 (S.D.N.Y. June 6, 2007). Plaintiff's complaint contains no such allegations. To the contrary, Plaintiff alleges that the Administrative Committee controlled the Plan and made decisions relevant to its operation and administration. *See* Compl. ¶¶ 12-13. At oral argument, Plaintiff suggested that Antwine may have served on the Administrative Committee at some point during the Class Period. Tr. at 71:9-19. Any

allegation to that effect, however, is absent from the Complaint. Therefore, Plaintiff's claims against Kitty Antwine are dismissed.

## IV.    Leave to Amend

Having dismissed Plaintiff's share-class, stable value fund, and excessive-fees claims, the Court considers whether to grant Plaintiff leave to amend his Complaint. Plaintiff did not seek leave to amend in his opposition brief, *see* Opp., but sought leave during oral argument in the event that the Court dismissed any of his claims, *see* Tr. at 73:13-16. Moreover, Plaintiff also indicated in his supplemental brief that he would amend his complaint to plead that he invested in the GIA Fund if required to do so. Dkt. 54 at 2 n.1.

Under Rule 15(a), a court "should freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). Although Plaintiff did not request leave to amend until oral argument, "the lack of a formal motion is not sufficient ground for a district court's dismissal [of the complaint] without leave to amend, so long as the plaintiff has made its willingness to amend clear." *McLaughlin v. Anderson*, 962 F.2d 187, 195 (2d Cir. 1992). Even if Plaintiff had not requested leave to amend during oral argument, "the Court may grant leave to amend *sua sponte*." *Secure Source Claims Co. v. Miller*, No. 22—cv-09764 (JGLC) (OTW), 2024 WL 1342804, at *9 (S.D.N.Y. Mar. 29, 2024) (quoting *In re Garrett Motion Inc. Sec. Litig.*, No. 20-cv-07992 (JPC), 2022 WL 976269, at *18 (S.D.N.Y. Mar. 31, 2022)).

Here, the Court will grant Plaintiff leave to file an amended complaint. Plaintiff has not yet amended his complaint, and it is not obvious that amendment would be futile. *See Anderson v. Advance Publ'ns, Inc.*, No. 22-cv-06826 (AT), 2023 WL 3976411, at *5 (S.D.N.Y. June 13, 2023) (granting leave to file second amended complaint "because the deficiencies described in [the court's] order might be cured by amendment"). Any prejudice from amendment would be minimal to Defendants, who are on notice as to the basic nature of Plaintiff's claims and the

circumstances underlying them.  Defendants' reference to one out-of-circuit case that dismissed with prejudice breach-of-fiduciary claims – without any consideration of futility, undue delay, or bad faith – does not convince the Court to deny leave to amend.  *See* Dkt. 45 (citing *Meiners v. Wells Fargo & Co.*, No. 16-cv-03981, 2017 WL 2303968 (D. Minn. May 25, 2017), *aff'd*, 898 F.3d 820 (8th Cir. 2018)).  Moreover, Defendants have indicated that they are amenable to Plaintiff amending his complaint at least to specifically plead that he invested in the GIA Prudential Fund.  Dkt. 50 at 1 n.1.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.  Plaintiff's share-class, stable value fund, and administrative-fees claims are dismissed without prejudice.  Plaintiff's claim as to Kitty Antwine is likewise dismissed without prejudice.  If Plaintiff chooses to amend his Complaint, he must do so within 30 days of this Opinion and Order.

The Clerk of Court is respectfully directed to terminate the motion at Dkt. 14.

Dated:  November 7, 2024
        New York, New York

SO ORDERED.

_____
JENNIFER L. ROCHON
United States District Judge