UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROBERT HUMPHRIES and DENNIS
MOWRY, individually and on behalf of all
others similarly situated,

                    Plaintiffs,

          -against-

MITSUBISHI CHEMCIAL AMERICA,
INC., MITSUBISHI CHEMICAL AMERICA
EMPLOYEES' SAVINGS PLAN
ADMINISTRATIVE COMMITTEE, and
JANE AND/OR JOHN DOES 1-10

                    Defendants.

Case No. 1:23-cv-06214 (JLR)

**<u>OPINION AND ORDER</u>**

JENNIFER L. ROCHON, United States District Judge:

      Robert Humphries ("Humphries") and Dennis Mowry ("Mowry," and, together with Humphries, "Plaintiffs") bring this putative class action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, against their former employer Mitsubishi Chemical America, Inc. ("Mitsubishi Chemical"), the Administrative Committee of the Mitsubishi Chemical America Employees' Savings Plan (the "Administrative Committee"), and the members of Mitsubishi Chemical's Board of Directors, John/Jane Does 1-10 (collectively, "Defendants"). *See* Dkt. 56 (the "Amended Complaint" or "AC"). Plaintiffs allege that, with respect to the Mitsubishi Chemical America Employees' Savings Plan (the "Plan"), Defendants violated their fiduciary obligations under federal law by failing to monitor share class discounts available to the Plan and the Plan's administrative fees and expenses. The Court previously granted Defendants' motion to dismiss the initial Complaint, filed only by Humphries on behalf of the putative class, for lack of standing and failure to state a claim, but granted Humphries leave to amend. *See generally Humphries v. Mitsubishi Chem. Am., Inc.*, No. 1:23-

cv-06214 (JLR), 2024 WL 4711296 (S.D.N.Y. Nov. 7, 2024) (*Humphries I*).  Now before the

Court is Defendants' motion to dismiss the Amended Complaint.  Dkt. 59.  For the following

reasons, the motion to dismiss is GRANTED in part and DENIED in part.

## BACKGROUND

### I.    Factual Background[1]

The Plan is a defined-contribution plan.  AC ¶ 1.  According to ERISA, a defined-

contribution plan is a:

> pension plan which provides for an individual account for each participant and for
> benefits based solely upon the amount contributed to the participant's account, and
> any income, expenses, gains and losses, and any forfeitures of accounts of other
> participants which may be allocated to such participant's account.

29 U.S.C. § 1002(34); *see Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 102 (2d Cir. 2021) ("Defined

contribution plans are retirement plans in which the employee contributes directly to her

individual account, and the benefits that will ultimately accrue to the employee are a function of

the amount she contributes to investments in the plan and the market performance of those

investments, minus the expenses of plan administration.").

Established in 1994, the Plan covers substantially all employees of Mitsubishi Chemical

(and of affiliated employers that have adopted the Plan) who meet the Plan's age and service

---

[1] Unless otherwise stated, the following facts are taken from the Amended Complaint and
assumed to be true for purposes of this motion.  *See New Eng. Carpenters Guaranteed Annuity &
Pension Funds v. DeCarlo*, 80 F.4th 158, 168 (2d Cir. 2023), *superseded on reh'g on other
grounds*, 122 F.4th 28 (2d Cir. 2024).  "A court 'must consider the complaint in its entirety, as
well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss,
in particular, documents incorporated into the complaint by reference and matters of which a
court may take judicial notice.'"  *In re Lottery.com, Inc. Sec. Litig.*, 765 F. Supp. 3d 303, 322
(S.D.N.Y. 2025) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)).
"A court may also consider a document, even if not incorporated into the complaint or subject to
judicial notice, if 'the complaint relies heavily upon its terms and effect, thereby rendering the
document "integral" to the complaint.'"  *Id.* (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d
104, 111 (2d Cir. 2010)).

requirements.  AC ¶ 11.  During the Class Period — defined as July 19, 2017, to July 19, 2023, *see id.* ¶ 9 n.3 ("[T]he Class Period begins six years before the date of the filing of this Complaint.") — the Plan had between 2,873 and 4,656 participants, and between $376,728,654 and $700,368,614 in assets, *id.* ¶ 11.  The Plan is sponsored by Mitsubishi Chemical, who is also listed as the "Plan Administrator" on the Plan's annual Form 5500 reports.  *Id.* ¶ 12.  Mitsubishi Chemical's Board of Directors appointed an Administrative Committee to manage the Plan's operations and administration.  *Id.* ¶ 13.  Plaintiffs allege that Defendants Mitsubishi Chemical, the Administrative Committee, and the Board of Directors are all "fiduciaries" of the Plan "because they have sole authority to amend or terminate, in whole or part, the Plan, and have discretionary authority to control the operation, management, and administration of the Plan." *Id.* ¶ 14.  Plaintiffs were participants in the Plan during the Class Period, and Mowry invested in the MFS Value Fund and Pioneer Bond Fund.  *Id.* ¶¶ 9-10.

During the Class Period, Prudential Trust Company served as trustee of the Plan, and Prudential Insurance Company of America and Prudential Retirement Insurance and Annuity Company served as custodians to the Plan for certain investments.  *Id.* ¶ 15.  UBS Financial Services Inc. ("UBS") provided investment advice to the Plan as its financial consultant from 2017 to 2020, and was later replaced by Sageview Advisory Group, LLC.  *Id.*

### A.  Mutual-Fund Share Classes

Plaintiffs first take issue with Defendants' monitoring of the mutual-fund share classes. The Court provided an overview of Plaintiffs' share-class theory in *Humphries I*, including the difference between "retail" and "institutional" share classes.  2024 WL 4711296, at *2. Plaintiffs once more assert that, because Defendants "could easily meet [mutual funds'] minimum investment requirements," they "had access to . . . low-cost institutional share classes." AC ¶ 25.  But "[i]nstead of monitoring and taking advantage of volume discounts in purchasing

mutual fund shares," Defendants offered high-cost retail share classes as investment options for

the Plan.  *Id.*  As a result, "the Plan fiduciaries wasted the assets of the Plan by failing to monitor

the available share classes and to select the lowest share class of the funds for inclusion in the

plan menu."  *Id.*

As in Humphries' initial Complaint, Plaintiffs' Amended Complaint identifies seven

mutual-fund investment options for which Defendants failed to select the lowest-cost share class

available, *id.* ¶¶ 27-33:

1. **MFS Value Fund:** Defendants invested in share class "A" (MEIAX), which, in 2017, had an expense ratio of 0.86%.  *Id.* ¶ 27.  That year, other share classes, such as share class "R6," had an expense ratio of 0.49%.  *Id.*  Defendants kept their investments in share class A until 2021, when they switched to share class R6, which then had an expense ratio of 0.45%.  *Id.*

2. **Prudential Jennison Mid-Cap Growth Fund:** Defendants invested in share class "Z" (PEGZX), which, in 2017, had an expense ratio of 0.76%.  *Id.* ¶ 28.  That year, share class "Q" had an expense ratio of 0.58%.  *Id.*  Defendants kept their investments in share class Z until 2019, when they removed the investment option from the Plan.  *Id.*

3. **Pioneer Fundamental Growth Fund:** Defendants invested in share class "Y" (FUNYX), which, in 2017, had an expense ratio of 0.79%.  *Id.* ¶ 29.  That year, share class "K" had an expense ratio of 0.67%.  *Id.*  Defendants kept their investments in share class Y until 2021, when they removed the investment option from the Plan.  *Id.*

4. **Goldman Sachs Small Cap Value Fund:** Defendants invested in share class "I" (GSSIX), which, in 2017, had an expense ratio of 1.01%.  *Id.* ¶ 30.  That year, share class "R6" had an expense ratio of 0.94%.  *Id.*  Defendants kept their investments in share class I until 2021, when they removed the investment option from the Plan.  *Id.*

5. **Janus Henderson Flexible Bond Fund:** Defendants invested in share class "I" (JFLEX), which, in 2017, had an expense ratio of 0.56%.  *Id.* ¶ 31.  Share class "N" had an expense ratio of 0.44% in 2016 and 0.45% in 2017.  *Id.*  Defendants kept their investments in share class I until 2018, when they removed the investment option from the Plan.  *Id.*

6. **Virtus Duff & Phelps Real Estate Securities Fund:** Defendants invested in share class "I" (PHRIX), which, in 2017, had an expense ratio of 1.13%.  *Id.* ¶ 32.  That year, share class "R6" had an expense ratio of 0.96%.  *Id.*  Defendants kept their investments in share class I until 2018, when they removed the investment option from the Plan.  *Id.*

7. **Pioneer Bond Fund:** Defendants invested in share class "Y" (PICYX), which had an expense ratio of 0.59% in 2017 and 2018, 0.47% in 2019, and 0.46% in 2020. *Id.* ¶ 33. Share class "K" had an expense ratio of 0.47% in 2017, 0.35% in 2018, and 0.34% in 2019 and 2020. *Id.* Defendants kept their investments in share class Y from 2017 through 2020. *Id.*

Therefore, according to Plaintiffs, "given the choice of two identical investments — with the same assets, investment style, and management — Defendants chose the more expensive product." *Id.* ¶ 36.

## B. Administrative Fees

Next, Plaintiffs allege that "Defendants failed to monitor" the Plan's "excessive recordkeeping costs." AC at 16 (initial capitalization omitted).[2]  According to Plaintiffs, "[n]early all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost." *Id.* ¶ 39.  Plaintiffs identify two types of essential recordkeeping services they contend are "provided by all national recordkeepers for plans with significant bargaining power (like the Plan)." *Id.*  First, "an overall suite of recordkeeping services" is provided to large plans "as part of a 'bundled' arrangement,'" including but not limited to basic account recordkeeping, transaction processing, participant communications, accounting and audit services, and plan consulting services. *Id.*  According to Plaintiffs, "[t]hese services are offered by all recordkeepers for one price . . . regardless of the services chosen or utilized by a plan." *Id.* ¶ 40.  The second category of essential administrative services involves separate fees based on individual participants' preferences, including fees for "loan processing, brokerage services/account maintenance," "[d]istribution services," and "[p]rocessing of qualified domestic relations orders." *Id.* ¶ 41.  Plaintiffs allege that recordkeepers in the defined-contribution

---

[2] Plaintiffs allege that "[r]ecordkeeping and administrative services fees are one and the same" and that "[t]he term 'recordkeeping' is a catchall term for the suite of administrative services typically provided to a . . . plan." AC ¶ 39.

industry "all offer the same bundles and combinations of services," *id.* ¶ 42, and that the cost of recordkeeping services is a function of the number of participants in a plan, with plans with large numbers of participants benefitting from economies of scale, *id.* ¶ 43.

Plaintiffs allege that from 2017 to 2021, "Plan participants were paying excess fees in the range of $84 - $211." *Id.* ¶ 48. In 2017, the Plan paid $605,956 in total recordkeeping expenses,[3] or an average of about $211 per participant. *Id.* In 2018, the Plan paid $568,520, averaging about $155 per participant. *Id.* In 2019, the Plan paid $573,888 in total recordkeeping expenses, averaging about $152 per participant. In 2020, the Plan paid $310,970 in recordkeeping expenses, averaging about $84 per participant. *Id.* In 2021, the Plan paid $392,455 in recordkeeping expenses, also averaging about $84 per participant. *Id.*

Plaintiffs allege that these fees exceeded those of "substantially similar plans" that provided "materially identical services" for the same time period, that is, 2017 to 2021. *Id.* ¶ 49. In 2017, those plans had from 1,131 to 5,734 participants and had between $46,806,475 to $602,015,434 in assets under management, for which the administrative costs per participant ranged from $18 to $65. *Id.* ¶ 49. In 2018, the comparator plans had between 2,002 to 6,149 participants and had between $64,282,737 and $574,691,384 in assets under management, for which the administrative costs per participant ranged from $9 to $66. *Id.* In 2019, the comparator plans had between 2,630 to 6,215 participants and had $120,062,282 to $699,843,742 assets in management, with the administrative costs per participant ranging from $9 to $66. *Id.* In 2020, the comparator plans had between 3,514 to 6,266 participants and had $212,160,917 to $797,670,577 in assets under management, for which the administrative costs per participant ranged from $10 to $71. *Id.* In 2021, those plans had between 3,549 to 6,140

---

[3] These recordkeeping expenses are disclosed in the Form 5500s. AC ¶ 48 n.20.

participants and had $322,946,902 to $910,498,456 in assets under management, for which the administrative costs per participant ranged from $8 to $57.  *Id.*

## II.    Procedural History

Humphries brought this action, individually and on behalf of all others similarly situated, on July 19, 2023.  *See generally* Dkt. 1.  The initial Complaint asserted that Defendants violated their fiduciary obligations under federal law by failing to monitor (1) share class discounts available to the Plan, (2) the Plan's stable value fund, and (3) the Plan's administrative fees and expenses.  *See generally id.*  Defendants moved to dismiss the Complaint on October 2, 2023. Dkts. 14, 15.  On November 7, 2024, the Court granted Defendants' motion to dismiss, dismissing Humphries' share class and stable value fund claims for a lack of standing, and his administrative fees claim on the merits for failure to state a claim, all without prejudice.  *See Humphries I*, 2024 WL 4711296, at *7-8, *10.  The Court also dismissed Kitty Antwine, signatory to the Plan's Form 5500 reports during the Class Period, as a defendant.  *Id.* at *11.

On December 6, 2024, Plaintiffs filed the Amended Complaint, adding Mowry as a plaintiff and dropping the stable value fund claim.  *See generally* AC.  On January 31, 2025, Defendants filed a motion to dismiss the Amended Complaint.  Dkt. 59; Dkt. 60 ("Br.").  The motion is fully briefed.  *See* Dkt. 61 ("Opp."); Dkt. 64 ("Reply").[4]

### LEGAL STANDARD

Under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

---

[4] The parties requested oral argument via notation on its motion.  The Court declines this request because the parties' briefing was sufficient and oral argument would not materially assist the Court.  *See Dotson v. Griesa*, 398 F.3d 156, 159 (2d Cir. 2005) ("A district court acts well within its discretion in deciding dispositive motions on the parties' written submissions without oral argument.") (alteration adopted).

*Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021) (en banc) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court draws all reasonable inferences in the plaintiff's favor and accepts as true all nonconclusory allegations of fact. *Id.* However, a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully" and more than "facts that are 'merely consistent with' a defendant's liability." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Determining whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

In considering a Rule 12(b)(6) motion to dismiss, "district courts 'may review only a narrow universe of materials,' which includes 'facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, matters of which judicial notice may be taken,' as well as 'documents not expressly incorporated by reference in the complaint that are nevertheless "integral" to the complaint.'" *Clark v. Hanley*, 89 F.4th 78, 93 (2d Cir. 2023) (brackets and ellipses omitted) (quoting *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016)). "Where a document is referenced in a complaint, 'the documents control and this Court need not accept as true the allegations in the . . . complaint.'" *Tongue v. Sanofi*, 816 F.3d 199, 206 n.6 (2d Cir. 2016) (quoting *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000)).

As an initial matter, Plaintiffs argue that Defendants impermissibly ask the Court to "impose a heightened pleading standard." Opp. at 7 (second alteration in original) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009)). The Court disagrees. Defendants do not seek, as Plaintiffs suggest, a "heightened pleading standard;" indeed, such a standard would not be appropriate here. *See, e.g.*, *Sacerdote*, 9 F.4th at 107 ("[A]s is true in

many contexts, a claim under ERISA may withstand a motion to dismiss based on sufficient circumstantial factual allegations to support the claim, even if it lacks direct allegations of misconduct.").  Rather, Defendants merely revert to well-established pleading principles, including that a court need not accept as true "legal conclusions," *Singh v. Deloitte LLP*, 650 F. Supp. 3d 259, 265 (S.D.N.Y. 2023) (quoting *Iqbal*, 556 U.S. at 678), and that Plaintiffs' factual allegations, while assumed to be true, must still "allow the court to reasonably infer [that] the process" of managing the Plan's fees and share classes "was flawed," *Gonzalez v. Northwell Health, Inc.*, 632 F. Supp. 3d 148, 165 (E.D.N.Y. Sept. 30, 2022) (quoting *Cunningham v. USI Ins. Servs., LLC*, No. 21-cv-01819 (NSR), 2022 WL 889164, at *3 (S.D.N.Y. Mar. 25, 2022)).

With this framework in place, the Court turns to Defendants' arguments for dismissal.

## DISCUSSION

Defendants move to dismiss the Amended Complaint on several grounds.  First, Defendants challenge Plaintiffs' share class claims on standing grounds, arguing that Plaintiffs lack standing to challenge mutual funds they did not personally invest in.  Br. at 12-13.  Second, Defendants move to dismiss the share class and excessive fees claims for failure to allege a breach of fiduciary duty.  *Id.* at 6-12, 13-14.  Finally, Defendants move to dismiss Mitsubishi Chemical and the Board of Directors as defendants in this action.  *Id.* at 14-16.

The Court turns first to the threshold issue of standing.

## I.    Standing[5]

Plaintiffs allege that Defendants breached their duty of prudence by offering more expensive mutual-fund share classes when cheaper, identical share classes of the same fund were

---

[5] Although Defendants move to dismiss the Amended Complaint under Rule 12(b)(6), Dkt. 59, their motion to dismiss for a lack of standing should have been brought under Rule 12(b)(1) because it is a jurisdictional issue.  *See, e.g., Boyette v. Montefiore Med. Ctr.*, No. 22-cv-05280 (JGK), 2024 WL 1484115, at *5 (S.D.N.Y. Apr. 5, 2024) (acknowledging that standing for

available as investment options for the plan.  *See* AC ¶¶ 23-36.  Although Defendants do not contest that Plaintiffs have standing for their excessive fees claim,[6] Defendants move to dismiss Plaintiffs' share class claim because Plaintiffs collectively invested in only two of the seven challenged funds.  For the reasons set forth below, the Court finds that Plaintiffs have class standing to assert claims challenging all seven of the mutual funds, including those funds that they did not personally invest in.

Article III standing is a requirement for this Court's jurisdiction.  *See, e.g.*, *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 64 (2d Cir. 2012) ("It is well established that 'a plaintiff must demonstrate standing for each claim [s]he seeks to press.'" (alteration in original) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006))); *In re Omnicom ERISA Lit.*, No. 20-cv-04141 (CM), 2021 WL 3292487, at *6-10 (S.D.N.Y. Aug. 2, 2021) (examining standing of participant in defined-contribution plan to bring ERISA claims).  To establish Article III standing, a "plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *TransUnion LLC v.*

---

ERISA claim is a jurisdictional matter); *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 210 (2d Cir. 2020) ("A motion to dismiss for lack of Article III standing challenges the subject-matter jurisdiction of a federal court and, accordingly, is properly brought under Fed. R. Civ. P. 12(b)(1).").  The Court shall therefore construe Defendants' motion to dismiss Plaintiffs' share-class claim for a lack of standing as a 12(b)(1) motion.  *See McLearn v. Cowen & Co.*, 660 F.2d 845, 849 (2d Cir. 1981) ("The failure of plaintiff's counsel to refer to the proper rule number does not prevent [the Court] from granting the relief that plaintiff in substance asked for, especially where defendants had notice of and argued against that relief.").

[6] Plaintiffs have standing for their excessive fee claims because "all class participants, including Plaintiff[s], were subject to the Plan's administrative fees," and "those fees depended not upon the amount of assets in a plan participant's account, but on the number of total participants within the Plan."  *Humphries I*, 2024 WL 4711296, at *5 n.3 (collecting cases); *see also* AC ¶¶ 9-10, 43.

*Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61

(1992)).  "The party invoking federal jurisdiction bears the burden of establishing these

elements."  *Lujan*, 504 U.S. at 555.  "[T]o demonstrate a constitutionally justiciable injury under

ERISA, plaintiffs must allege that they suffered specific losses as a result of the alleged breach

of fiduciary duty."  *In re UBS ERISA Litig.*, No. 08-cv-06696 (RJS), 2014 WL 4812387, at *6

(S.D.N.Y. Sept. 29, 2019), *aff'd sub nom. Taveras v. UBS AG*, 612 F. App'x 27 (2d Cir. 2015)

(summary order).

As the Court explained in *Humphries I*, "[t]here is no ERISA exception to Article III,"

*Thole v. U.S. Bank N.A.*, 590 U.S. 538, 547 (2020), and therefore, "Plaintiffs cannot rely solely

on the fact that [actions] brought pursuant to ERISA are derivative and not direct actions to

establish standing."  *Humphries I*, 2024 WL 4711296, at *6 (citing *Omnicom*, 2021 WL

3292487, at *10).  "For that reason, district courts in this Circuit routinely hold that participants

in defined-contribution plans lack standing to bring claims challenging funds in which they did

not personally invest," because "a plan participant who does not invest their plan assets into a

particular fund offered in a defined-contribution plan will not have their individual plan benefit

affected in any way by that fund's performance or associated fees."  *Id.* at *6 (quoting *Singh*, 650

F. Supp. 3d at 265) (collecting cases).  *Humphries I* therefore dismissed Humphries' share class

claims for a lack of standing because Plaintiff had not alleged that he had invested in any of the

seven mutual funds.  *See id.* at *7.

As Defendants concede, the addition of Mowry as a plaintiff in the Amended Complaint

"undoubtedly cures the standing problem for the two funds in which he invested," Br. at 12, that

is, the MS Value Fund and the Pioneer Bond Fund, AC ¶ 10.  But Defendants maintain that

"Plaintiffs still have not shown standing for the other five funds."  Br. at 12.  Plaintiffs in turn

invoke class standing, arguing that because Defendants "employ the same process in evaluating *all seven* funds," they have adequately pleaded Article III standing. Opp. at 8-9. For the reasons set forth below, the Court agrees that Plaintiffs have adequately pleaded class standing.

To assert class standing, the Second Circuit requires a plaintiff to show (1) "actual injury" as a result of the defendant's conduct, *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982)); and (2) that "such conduct" implicates the "same set of concerns" as those of the rest of the putative class, *id.* (quoting *Gratz v. Bollinger*, 539 U.S. 244, 267 (2003)). "The 'same set of concerns' are implicated and the named plaintiff[s] ha[ve] class standing where the claims of absent class members and the named plaintiff[s] require similar inquiries and proof." *Patterson v. Morgan Stanley*, No. 16-cv-06568 (RJS), 2019 WL 4934834, at *6 (S.D.N.Y. Oct. 7, 2019) (alterations in original) (quoting *Moreno v. Deutsche Bank Ams. Holding Corp.*, No. 15-cv-09936 (LGS), 2017 WL 3868803, at *10 (S.D.N.Y. Sept. 5, 2017)). "When this standard is satisfied, the named plaintiff's litigation incentives are sufficiently aligned with those of the absent class members that the named plaintiff may properly assert claims on their behalf." *Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 161 (2d Cir. 2014). Courts have applied the Second Circuit's class standing jurisprudence to determine whether ERISA plaintiffs have standing to assert claims based on funds they did not invest in. *See, e.g.*, *Antoine v. Marsh & McLennan Cos.*, No. 22-cv-06637 (JPC), 2023 WL 6386005, at *7 (S.D.N.Y. Sept. 30, 2023) ("Whether Plaintiffs have standing to assert claims based on [funds] they did not invest in . . . is most appropriately assessed under the Second Circuit's class standing jurisprudence."); *Patterson*, 2019 WL 4934834, at *6 (applying class standing doctrine to determine whether plaintiffs could challenge funds they did not personally

invest in).  "Although some courts in this district have deferred the issue of class standing until

class certification, others have addressed it on a motion to dismiss."  *Fletcher v. ConvergEx*

*Group LLC*, 388 F. Supp. 3d 293, 296-97 (S.D.N.Y. 2019) (collecting cases).

Plaintiffs satisfy the first prong of the *NECA* standing test insofar as they allege that

Mowry invested in two of the seven mutual funds, and was injured by Defendants' investment

decisions related to those funds.  *See* AC ¶ 10.  "Although the same cannot be said" with respect

to the five remaining funds, "*NECA*'s first prong seemingly requires only that plaintiffs suffer

*some* injury."  *Patterson*, 2019 WL 4934834, at *6.

Moreover, similar "inquiries and proof" and the "same set of concerns" are implicated

across each of the challenged mutual funds, satisfying the second prong of the *NECA* class

standing test.  *Id.* at *6 (quoting *Moreno*, 2017 WL 3868803, at *10).  Plaintiffs allege that

Defendants "neglected to keep and implement" a "viable review process and methodology," and

thus failed to substitute less expensive share classes of mutual funds for more expensive share

classes.  AC ¶ 3.  Plaintiffs' share class claims are therefore premised on Defendants'

purportedly deficient processes and methodologies: had Defendants implemented "a viable

methodology for selecting and monitoring mutual fund share classes," they would have

"monitor[ed] the Plan's investment options continuously" and "immediately take[n] advantage of

share class discounts as they became available."  *Id.*  "Because the alleged harms are premised

on the [same] process[es] Defendants used to manage the Plan," *Moreno*, 2017 WL 3868803, at

*10, "[p]roof that [d]efendants' management processes were imprudent will tend to prove

[p]laintiffs' individual claims *and* the imprudence claims of absent class members" who invested

in the five remaining funds, *Ruiloa v. Yale-New Haven Hosp., Inc.*, No. 22-cv-00111, 2023 WL

2301962, at *12 (D. Conn. Mar. 1, 2023).  *See also Beach v. JPMorgan Chase Bank, Nat'l*

*Ass'n*, No. 17-cv-00563 (JMF), 2019 WL 2428631, at *5 (S.D.N.Y. July 11, 2019) ("[T]he allegedly disloyal and imprudent conduct of defendants implicates the same set of concerns for investors in [all of the funds] because the conduct relates to the process[es] [d]efendants used to manage the [p]lan." (second alteration in original) (internal quotation marks omitted)); *Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 157 (S.D.N.Y. 2017) (finding that defendants' imprudent conduct "implicate[d] the same set of concerns" for investors in all nine challenged funds where plaintiffs "allege[d] that they and all other [p]lan participants who invested in the [funds] were injured in the same manner when defendants failed to monitor the [p]lan or to investigate alternatives").

    *Patterson v. Morgan Stanley*, cited by Defendants, Br. at 12, involved substantively different claims than those asserted here and therefore does not compel a contrary outcome. *See generally* 2019 WL 4934834. In *Patterson*, the plaintiffs alleged that defendants (1) improperly retained underperforming Morgan Stanley mutual funds; (2) selected Morgan Stanley funds with high fees; and (3) included poorly performing and/or untested Black Rock target-date retirement funds because they were paid by BlackRock to do so. *Id.* at *2. The court therein acknowledged that, at a "high level," plaintiffs' challenges across the mutual funds "raise[d] similar *questions* — for example, whether the fees paid to Morgan Stanley were inappropriately high, whether the funds were improperly retained, and whether [d]efendants' desire to develop a business relationship with BlackRock motivated [d]efendants to keep the BlackRock Trusts in the [p]lan." *Id.* at *6. But the court found that "the evidence that Plaintiffs will have to put forward to establish liability" would "vary from fund to fund," including with respect to whether the funds' fees were "inappropriately high" or whether a particular fund was in fact underperforming such that its inclusion in the Plan was imprudent. *Id. Patterson* therefore held

that plaintiffs had not adequately pleaded Article III standing with respect to investment options they had not personally invested in. *Id.* at *7. Here, Plaintiffs allege that Defendants' *overall* process with respect to monitoring share classes for mutual class funds and identifying share class discounts was deficient. As currently pleaded, therefore, Plaintiffs' claim does not require the particularized, fund-by-fund analysis that was required in *Patterson*.[7]

"Although plaintiffs will have to engage in a fund-specific inquiry to establish that the fiduciary breaches actually caused losses to the Plan . . . this type of inquiry does not preclude a finding of class standing." *Leber*, 323 F.R.D. at 158. "Instead, the Second Circuit's class standing doctrine focuses on the *conduct* of the defendant and whether that conduct implicates the same concerns for all putative class members." *Id.* (citing *NECA-IBEW*, 693 F.3d at 162). Here, Defendants' alleged conduct — the failure to "monitor[] and tak[e] advantage of volume discounts in purchasing mutual fund shares," AC ¶ 25 — is essentially the same across all of the challenged funds. Moreover, since the primary focus is on Defendants' alleged conduct, Defendants' arguments that "the different funds challenged have no relation to each other," and "do not even share a similar investment strategy," Reply at 4, are not dispositive. *See, e.g.*, *Leber*, 323 F.R.D. at 158 ("[D]espite the variations between the [funds], investors in all nine

---

[7] Defendants' citation to the district court's decision in *Singh v. Deloitte LLP* is similarly inapposite. *See* Reply at 3-4 (citing *Singh*, 650 F. Supp. 3d 259). In *Singh*, the court, noting the particular structure of a defined-contribution plan, held that "none of the plaintiffs ha[d] shown that the four challenged funds in which they did not invest caused them any particularized injury, and therefore lack[ed] standing to bring their claims against those four funds." *Singh*, 650 F. Supp. 3d at 265. However, *Singh* did not address class standing. Defendants' citation to cases standing for the general proposition that a concrete injury-in-fact is necessary to establish Article III standing for an ERISA claim, *see* Reply at 3 (first citing *Cunningham v. Cornell*, 145 S. Ct. 1020, 1032 (2025); and then citing *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1620-21 (2020)), similarly does not move the needle. *Thole* and *Cunningham*, like *Singh*, set the general contours for Article III standing in ERISA actions, but do not address class standing in an ERISA suit when the named plaintiff has suffered a concrete injury.

funds have the 'same necessary stake' in litigating whether [the] defendants' conduct amounted
to a breach of their fiduciary duties." (quoting *NECA*, 693 F.3d at 164)).  What is relevant here is
Plaintiffs' claim that, across the identified mutual funds, Defendants engaged in a common
process whereby they repeatedly selected more expensive retail shares over institutional shares
for inclusion in the Plan.  *See* AC ¶¶ 25-36.

For these reasons, the Court concludes that Plaintiffs have Article III standing with
respect to their share class claim, at least as currently pleaded.  The Court thus turns to the merits
of Plaintiffs' claims.

## II.    Breach of Fiduciary Duty

Plaintiffs argue that Defendants breached their duty of prudence with respect to the Plan
by (1) failing to offer the lowest-cost share classes of certain mutual-fund investments and
(2) paying excessive administrative fees.  AC ¶¶ 35, 61.

"To state a claim for breach of fiduciary duty under ERISA, a complaint must allege that
(1) the defendant was a fiduciary who (2) was acting in a fiduciary capacity, and (3) breached his
fiduciary duty."  *Bloom v. AllianceBernstein L.P.*, 725 F. Supp. 3d 325, 335 (S.D.N.Y. 2024)
(alteration adopted) (quoting *Cunningham*, 2022 WL 889164, at *2).  Fiduciaries under ERISA
must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), and
"for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and
(ii) defraying reasonable expenses of administering the plan," *id.* § 1104(a)(1)(A).  The statute
imposes a "prudent" person standard, requiring a fiduciary to act "with the care, skill, prudence,
and diligence under the circumstances then prevailing that a prudent man acting in a like
capacity and familiar with such matters would use in the conduct of an enterprise of a like
character and with like aims."  *Id.* § 1104(a)(1)(B).  "The prudence of a fiduciary 'is measured
according to the objective prudent person standard developed in the common law of trusts.'"

*Sacerdote*, 9 F.4th at 107 (quoting *Kastsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984)).

"[U]nder trust law, a fiduciary normally has a continuing duty of some kind to monitor

investments and remove imprudent ones." *Tibble v. Edison Int'l.*, 575 U.S. 523, 530 (2015).

"Because the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the

time the fiduciary acts, the appropriate inquiry will necessarily be context specific." *Fifth Third

Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014) (omission in original) (citation omitted)

(quoting 29 U.S.C. § 1104(a)(1)(B)).

"The duty of prudence standard focuses 'on a fiduciary's conduct in arriving at an

investment decision, not on its results.'" *Leber*, 323 F.R.D. at 157 (quoting *Pension Benefit

Guar. Corp. ex rel. Saint Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt., Inc.*,

712 F.3d 705, 716 (2d Cir. 2013) (*PBGC*)).  "[A] claim for breach of fiduciary duty under

ERISA may survive a motion to dismiss — even absent any well-pleaded factual allegations

relating directly to the methods employed by the ERISA fiduciary — if the complaint alleges

facts that, if proved, would show that an adequate investigation would have revealed to a

reasonable fiduciary that the investment at issue was improvident." *PBGC*, 712 F.3d at

718 (brackets omitted) (quoting *In re Citigroup ERISA Litig.*, 662 F.3d 128, 141 (2d Cir. 2011),

*abrogated in other part by Fifth Third Bancorp*, 573 U.S. 409).  Even so, plaintiffs "cannot rely,

after the fact, on the magnitude of the decrease in the [relevant investment's] price," nor is it

"necessarily sufficient to show that better investment opportunities were available at the time of

the relevant decisions." *Id.* (alteration in original) (quoting *In re Citigroup ERISA Litig.*, 662

F.3d at 140).  Rather, "Plaintiffs must allege facts sufficient to raise the plausible inference that

Defendants breached their duty of prudence in view of the facts available *at the time* they made

the challenged decisions." *Patterson*, 2019 WL 4934834, at *9.  Such a showing does not

require a plaintiff to make "factual allegations referring *directly* to" a fiduciary's "knowledge, methods, or investigations at the relevant times," but does require that a plaintiff set out "circumstantial factual allegations" that would allow the court to "reasonably infer from what is alleged that the [fiduciary's decisionmaking] process was flawed." *PBGC*, 712 F.3d at 718 (quotation marks omitted).  "Because the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts, the appropriate inquiry will necessarily be context specific." *Fifth Third Bancorp*, 573 U.S. at 425 (omission in original) (citation omitted) (quoting 29 U.S.C. § 1104(a)(1)(B)); *see Sacerdote*, 9 F.4th at 107 (noting that courts must exercise "particular care . . . in order to ensure that the . . . complaint alleges nonconclusory factual content raising a plausible inference of misconduct and does not rely on the vantage point of hindsight" (second omission in original) (brackets, emphasis, and quotation marks omitted)).

The Court addresses Plaintiffs' share class and excessive fees claims separately.

**A.  Share Class Claims**

Plaintiffs claim that Defendants breached their duty of prudence by offering more expensive mutual-fund share classes when cheaper, identical share classes of the same fund were available as investment options for the Plan.  *See* AC ¶¶ 23-36.  Plaintiffs support their allegations with seven examples of mutual funds for which the Plan could have selected share classes with lower expense ratios.  *Id.* ¶¶ 27-33.  This information was included in fund prospectuses and would have been available to inquiring fiduciaries when the fiduciaries decided to offer the funds in the Plans.  *See id.*

These allegations adequately state a claim for breach of the duty of prudence.  Plaintiffs have alleged "'that a superior alternative investment was readily apparent such that an adequate investigation' — simply reviewing the prospectus of the fund under consideration — 'would

have uncovered that alternative.'" *Sacerdote*, 9 F.4th at 108 (quoting *PBGC*, 712 F.3d at 719). "[T]he court, based on circumstantial factual allegations, may reasonably infer from what is alleged that the process" for selecting and monitoring the menu of share-class investment options available in the Plan "was flawed" or "that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *PBGC*, 712 F.3d at 718 (internal quotation marks and citation omitted). Plaintiffs' share-class allegations are akin to those in *Tibble*, where the petitioners "argued that respondents acted imprudently by offering six higher priced retail-class mutual funds as Plan investments when materially identical lower priced institutional-class mutual funds were available." 575 U.S. at 525-26. "[E]xpress[ing] no view on the scope of respondents' fiduciary duty," the Supreme Court remanded the case "for the Ninth Circuit to consider petitioners' claims that respondents breached their duties within the relevant [limitations] period." *Id.* at 531. The Ninth Circuit, in turn, remanded the case back to the district court "to consider whether there was a breach of the fiduciary duty." *Tibble v. Edison Int'l*, No. 07-cv-05359, 2017 WL 3523737, at *6 (C.D. Cal. Aug. 16, 2017) (citing *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016)). Following a bench trial, the district court found, for all mutual funds at issue, that "no prudent fiduciary would purposefully invest in higher cost retail shares" and granted judgment for the plaintiffs. *Id.* at *12.

*Sacerdote* similarly involved "specific allegations regarding the basis point differences in costs between retail and institutional shares" of mutual funds offered in the plans at issue. 9 F.4th at 105. The plaintiffs alleged that "this information was included in fund prospectuses and would have been available to inquiring fiduciaries when the fiduciaries decided to offer the funds in the Plans." *Id.* at 108. Noting that "the choice" presented to the plans' fiduciaries "was simply between higher-or lower-cost shares of the same fund," the Second Circuit held that the

plaintiffs had sufficiently alleged a share-class claim. *Id.* at 109; *see id.* at 108-09. Here, too, Plaintiffs allege that Defendants faced a "binary choice" between otherwise identical sets of retail and institutional shares and acted imprudently in selecting the higher-cost share classes. *Id.* at 109; *see* AC ¶ 36.

Defendants argue that Plaintiffs' theory of class standing necessarily undermines their breach of fiduciary claim. According to Defendants, since Plaintiffs' theory of standing "rests on [Mitsubishi Chemical] having the same process for evaluating share classes for *all* investments," Plaintiffs' own allegations show that Mitsubishi Chemical "actively monitored its investments during the class period." Br. at 13. In other words, because the Plan removed several of the challenged funds from the fund lineup during the class period, and converted a single mutual fund from retail-class to institutional shares, Defendants were engaged fiduciaries that were not "asleep at the wheel." *Id.* Plaintiffs dispute that the removal of some mutual-fund options "nearly four years" into the Class Period reflects a prudent process, particularly when Defendants "could have simply transitioned the higher-cost share classes to lower-cost alternatives" at that time. Opp. at 10-11. Whether Defendants were actively monitoring the Plan's share-class offerings or playing catch-up cannot be resolved by the instant motion. At least at the pleading stage, the Court must draw reasonable inferences based on Defendants' alleged conduct in Plaintiffs' favor. *See Sacerdote*, 9 F.4th at 107-08; *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) ("The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion."). And, drawing all inferences in favor of Plaintiffs, Plaintiffs have adequately pleaded that the Plan's share-class selection was imprudent. Neither the fact that a single mutual fund

was moved from higher-cost to lower-cost shares, nor that the remaining funds were eventually

removed from the Plan altogether, defeat Plaintiffs' well-pleaded allegations.

Defendants also raise the possibility of fee rebates, in the form of "revenue sharing," as

an alternative explanation for Defendants' decision to select higher-cost share classes.  Br. at 13.

They suggest that the difference in expense ratios between share classes is because the more

expensive share classes allow revenue sharing to help facilitate payments to the Plan's service

providers, unlike the cheaper share classes.  *See id.*; *Boyette v. Montefiore Med. Ctr.*, No. 22-cv-

05280 (JGK), 2023 WL 7612391, at *2 (S.D.N.Y. Nov. 13, 2023) ("Recordkeeping expenses can

either be paid directly from plan assets, or indirectly by the plan's investments in a practice

known as revenue sharing." (internal quotation marks omitted)); *Leimkuehler v. Am. United Life

Ins. Co.*, 713 F.3d 905, 909 (7th Cir. 2013) ("[E]xpense ratios and revenue-sharing payments

[generally] move in tandem: the higher a given share class's expense ratio, the more the fund

pays [the recordkeeper] in revenue sharing.").  Defendants contend that, due to revenue sharing,

"a retail share class may actually be the cheapest option overall for plan participants."  Br. at 14

(emphasis omitted).

That revenue sharing may have factored into Defendants' decisionmaking "is plausible,

and Defendants may well be able to substantiate it at the summary judgment stage."  *Davis v.

Salesforce.com, Inc.*, No. 21-15867, 2022 WL 1055557, at *1 (9th Cir. Apr. 8, 2022)

(unpublished disposition) (rejecting similar revenue-sharing objection at the pleading stage).

However, "the notion that 'prudent fiduciaries may very well choose to offer retail class shares

over institutional class shares' . . . provides no basis to dismiss pleadings that otherwise generate

plausible inferences of the claimed misconduct.  Such an argument 'goes to the merits and is

misplaced at this early stage.'"  *Sacerdote*, 9 F.4th at 108 (first quoting *Sacerdote v. N.Y. Univ.*,

No. 16-cv-06284 (KBF), 2017 WL 3701482, at *11 (S.D.N.Y. Aug. 25, 2017), *vacated and remanded*, 9 F.4th 95; and then quoting *Sweda v. Univ. of Pa.*, 923 F.3d 320, 333 (3d Cir. 2019)); *see Hughes v. Nw. Univ.*, 63 F.4th 615, 635-36 (7th Cir. 2023) ("[Revenue sharing] is just one possible explanation for why [defendant] chose to retain such a large number of retail-class shares. But this explanation is not so much more obvious than plaintiffs' account that this issue can be resolved on the pleadings."); *Forman v. TriHealth, Inc.*, 40 F.4th 443, 450 (6th Cir. 2022) (recognizing that "[e]qually reasonable inferences," such as the availability of revenue-sharing arrangements, could explain why a fiduciary would choose retail over institutional shares, but acknowledging that "at the pleading stage, it is too early to make these judgment calls"). Discovery will confirm, for example, how revenue sharing affected the overall administration of the Plan. *See Albert v. Oshkosh Corp.*, 47 F.4th 570, 581 (7th Cir. 2022) ("Some revenue sharing proceeds go to the recordkeeper in the form of profits, and some go back to the investor, but there is not necessarily a one-to-one correlation such that revenue sharing always redounds to investors' benefit."). While Plaintiffs must plead facts "permitting the court to infer more than the mere possibility of misconduct," ERISA does not require them, at the pleading stage, "to rule out every possible lawful explanation for the conduct [they] challenge[]." *Sacerdote*, 9 F.4th at 108 (alteration adopted). That retail-share classes may offer retirement plans "other benefits" therefore does not warrant, at this juncture, dismissing Plaintiffs' claims.

Defendants' cited authorities, all of which are out of district and therefore not binding on this Court, do not alter the Court's reasoning. *See* Br. at 14. For example, *Mator v. Wesco Distribution, Inc.*, 102 F.4th 172 (3d Cir. 2024), "decline[d] to articulate a bright-line rule that a plan administrator breaches its fiduciary duty merely by offering retail-class investment shares,"

*id.* at 191, but nevertheless found that plaintiffs in that case "ha[d] alleged a fiduciary breach

based on the [p]lan's offerings of retail-class mutual fund shares," *id.* at 190.  To the extent

Defendants' other cited authorities are inconsistent with the reasoning of the Second Circuit in

*Sacerdote*, this Court is bound by *Sacerdote*'s analysis.

For all the above reasons, the Court finds that Plaintiffs have adequately pleaded a share-

class claim against Defendants.

## B.  Recordkeeping Fees

Defendants assert that Plaintiffs' excessive recordkeeping fees claim "is a rerun" of the

initial complaint.  Br. at 1.  That is, the Amended Complaint still "contains *no* factual allegations

about the services offered by [the Plan] (or any of Plaintiffs' comparator plans)," *id.*, in defiance

of Second Circuit precedent.  The Court agrees.

As the Court explained in *Humphries I*, with regard to excessive recordkeeping fee

claims, courts consider the "particular services rendered by the recordkeeper, the fees of

comparable plans and recordkeepers at the time, and the bargaining power of the plan to

negotiate competitive recordkeeping fees."  *Humphries I*, 2024 WL 4711296, at *8 (quoting

*Gonzalez*, 632 F. Supp. 3d at 165-66).  "[P]laintiffs need plausibly to allege that challenged fees

'were excessive relative "to the services rendered,"' or to provide allegations 'concerning other

factors relevant to determining whether a fee is excessive under the circumstances.'"  *Singh*, 123

F.4th at 93-94 (quoting *Young v. Gen. Motors Inv. Mgmt. Corp*., 325 Fed. App'x 31, 33 (2d Cir.

2009) (summary order)).  In *Humphries I*, Humphries relied primarily on (1) industry surveys;

(2) administrative fees for the "substantially similar" Mitsubishi Electric Plan; and

(3) administrative fees for "32 other plans with similar numbers of participants and amounts of

assets" to argue that the Plan's fees were excessive.  2024 WL 4711296, at *9.  In finding these

allegations insufficient to state a claim, this Court underscored that Humphries's comparators

"lack[ed] details as to the administrative services behind the numbers cited" — a "significant" omission because "administrative services can vary greatly among different plans." *Id.*

Plaintiffs argue that they have addressed *Humphries I*'s concerns by "specifying the types of services the Plan and its comparators paid for and making an 'apples to apples' comparison." Opp. at 13. According to Plaintiffs, they have "alleged the essential bundle of services recordkeepers typically provide which are offered 'buffet-style.'" *Id.* But Plaintiffs' Amended Complaint largely parrots the allegations rejected in *Humphries I*: Plaintiffs argue that Plan participants paid, on a raw fee-to-fee basis, more in recordkeeping expenses than "average" plans in NEPC surveys and certain "substantially similar" plans.[8] And while Plaintiffs have added more specificity by providing side-by-side comparisons of fees for additional years in the Class Period, they have not proffered any further factual allegations with respect to the nature or quality of services provided by the Plan or Plaintiffs' identified comparators. Instead of amending the Complaint to allege that the Plan's administrative fees were in fact excessive in relation to the "particular services rendered," Plaintiffs contend that "the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services." AC ¶ 40. According to Plaintiffs, "recordkeepers offer a bundled set of essential services at a fixed price, irrespective of which specific services are ultimately selected by the Plan," Opp. at 2, and such services are "offered by all recordkeepers for one price," AC ¶ 40. In fact, Plaintiffs go so far as to state that "[a]nyone who has passing familiarity with recordkeepers' responses to requests for proposals, their bids and their contracts understands and

---

[8] Specifically, Plaintiffs' Amended Complaint compares the "average recordkeeping fees" disclosed in Form 5500s under service codes "'15' and/or '64'" of "substantially similar plans" to the Plan's recordkeeping fees as "circumstantial evidence" that the fees the Plan paid were excessive during the class period. AC ¶ 49 & n.21

appreciates that the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services; any claim that recordkeeping expenses depend upon the service level provided to a plan is both false and frivolous." *Id.*

Plaintiffs' reasoning contravenes this Court's prior opinion and is squarely foreclosed by the Second Circuit's recent decisions in *Singh v. Deloitte LLP*, 123 F.4th 88, and *Boyette v. Montefiore Medical Center*, No. 24-1279, 2025 WL 48108 (2d Cir. Jan. 8, 2025) (summary order). Notably, both Second Circuit decisions were issued after Plaintiffs' filing of their Amended Complaint. In *Singh*, the Second Circuit underscored that excessive recordkeeping fee claims must provide a certain level of "specificity as to the type and quality of services provided by the [p]lan and its comparators." 123 F.4th at 98. The *Singh* plaintiffs alleged that defendants breached their fiduciary duty by failing to adequately manage the recordkeeping and administrative fees for their 401(k) plan. *Id.* at 90. There is little daylight between Plaintiffs' allegations and those deemed inadequate by the *Singh* court. There, as here, the plaintiffs argued that the "services chosen by a large plan do not affect the amount charged by recordkeepers for basic and fungible services" that make up "essential recordkeeping services," *id.* at 94, because the services provided to large plans are offered "for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan," *id.* at 91. The Second Circuit rejected the plaintiffs' comparisons with the recordkeeping fees of "comparable peer plans," *id.*, finding that plaintiffs "allege[d] next to nothing about the recordkeeping services provided by the [p]lan or the six other large plans that the [c]omplaint cites as allegedly lower-priced comparators," *id.* at 94. The complaint was "silent," for instance, as to "the number of services actually provided by either the [p]lan or its alleged comparators," and "d[id] not allege what level of service the [p]lan provided, nor whether less expensive comparator plans provided a similar quality of

service." *Id.* (internal quotation marks omitted).  Based on these deficiencies, the Second Circuit affirmed the dismissal of the plaintiffs' excessive fees claim.

*Boyette*, relying on *Singh*'s reasoning, likewise affirmed the dismissal of an excessive fee claim predicated on apples-to-oranges comparisons between the plaintiffs' plan and comparator plans.  *See* 2025 WL 48108, at *1.  In *Boyette,* although the complaint *"*identifie[d] several plans with lower per-participant fees, it fail[ed] to establish that these plans [were] suitable 'apple-to-apple' comparators in terms of services provided and other relevant characteristics." *Id.* (quoting *Singh*, 123 F.4th at 95).  In response to the plaintiffs' argument that "recordkeeping services are 'fungible' across providers, making detailed comparisons unnecessary," the Second Circuit — citing *Singh* — stated that variations in the cited comparator plans "contradict[ed] [plaintiffs'] assertion that such services are standardized and 'bel[ied] the implication that the allegation of a cost disparity alone, without some consideration of the surrounding context, categorically suggests imprudence.'" *Id.* at *2 (quoting *Singh*, 123 F.4th at 95).  And the Second Circuit held that "even if the ranges of services were similar across plans," the complaint still "fail[ed] to sufficiently allege 'what level of service the [p]lan provided or whether less expensive comparator plans provided a similar *quality* of service.'" *Id.* (quoting *Singh*, 123 F.4th at 94 (alteration adopted)).

Plaintiffs do not (and cannot) seriously contend with *Boyette* and *Singh*, instead stating that Defendants' reliance on those decisions "is misplaced."[9] Opp. at 15.  But the allegations in those cases are on all fours with Plaintiffs' excessive fees claim.  Akin to *Singh* and *Boyette*,

---

[9] In a cursory paragraph, Plaintiffs also overstate "significant differences" between this case and *Singh*.  Opp. at 17.  The fact that the *Singh* plaintiffs omitted indirect costs from their analysis and did not include comparators for each year of the class period, 123 F.4th at 95, is not the only reason the Second Circuit came to its decision, *see id.* at 96.  And in any event, *Boyette*, applying *Singh*'s reasoning, involved factual allegations nearly identical to those asserted here.

Plaintiffs rely on comparator plans with lower recordkeeping fees to support their claim, but yet again "fail to show that the Plan's fees were excessive 'relative to the services rendered.'" *Boyette*, 2025 WL 48108, at *1 (quoting *Singh*, 123 F.4th at 96).  The Amended Complaint here is "silent on the number of services actually provided" by either the Plan or Plaintiffs' identified comparators as well as the quality of such services — omissions that *Singh* and *Boyette* deemed fatal to plaintiffs' excessive fees claims.  *See Singh*, 123 F.4th at 94.  Indeed, "a plaintiff alleging excessive recordkeeping fees must provide 'meaningful benchmarks' and cannot rely on bare allegations that other plans paid less."  *Boyette*, 2025 WL 48108, at *1 (alteration adopted) (quoting *Singh*, 123 F.4th at 95).  Like the plaintiffs in *Singh* and *Boyette*, Plaintiffs here try to evade these pleading requirements by asserting that essential services are provided to large plans "as part of a 'bundled' arrangement for a buffet style level of service," AC ¶ 39; are "basic and fungible," *id.* ¶ 40; and are "offered by all recordkeepers for one price (typically at a per capita rate) regardless of the services chosen or utilized by a plan," *id.*  The Second Circuit has twice dismissed virtually identical allegations.

    *Boyette* and *Singh* also flatly rejected many of Plaintiffs' other counterarguments.  Taking Plaintiffs' arguments in turn, Plaintiffs first suggest that recordkeeping services are "fungible" across providers with prices typically set per capita, AC ¶ 40, making detailed comparisons between the Plan and comparators impracticable and unnecessary.  *Boyette* and *Singh* found that "the variation in fees" among the plaintiffs' own identified comparator plans "contradict[ed] their assertion that such services are standardized."  *Boyette*, 2025 WL 48108, at *2; *see also Singh*, 123 F.4th at 94 ("[T]he [complaint]'s own allegations, however sparse, show a range of recordkeeping fees even among the six large comparator plans, belying the implication that the allegation of a cost disparity alone, without some consideration of the surrounding context,

categorically suggests imprudence.").  There is certainly a wide range of recordkeeping fees amongst the comparator plans referenced in the Amended Complaint, belying Plaintiffs' assertion that the cost of recordkeeping services is primarily a function of the number of participants in a plan, not the nature of the services rendered.  For instance, the Docusign Inc. 401(k) Plan had an average per participant cost of $9 in 2019, which hiked up to $42 just a year later, despite the fact that the total number of participants in the Plan increased.  AC ¶ 49, at 28, 30.  As another example, in 2017, the Amica 401(k) Retirement Savings Plan and HealthFirst Profit Sharing 401(k) used the same recordkeeper, Vanguard, and had a difference of only thirty plan participants (4,790 versus 4,760), but their recordkeeping fees nevertheless differed by over $100,000.  *See id.* ¶ 49, at 25.  Similar points can be made regarding other comparator plans Plaintiffs employ in their Amended Complaint.  *See, e.g., id.* ¶ 49, at 26 (2018 recordkeeping fees of the Oppenheimer & Co. Inc. 401(K) Plan totaled $79,973 for 3,569 plan participants whereas the Arthrex 401(K) Retirement Savings Plan totaled $200,856 for 3,255 plan participants in the same year).

Second, Plaintiffs assert that dismissal here would be inappropriate because Plaintiffs do not have confidential information pertaining to the services received, which is held by the Plan. Opp. at 15.  This argument, too, was rejected by *Singh*: the court acknowledged that "details about a fiduciary's methods and actual knowledge tend to be 'in the sole possession of [that fiduciary],'" but nevertheless found that Plaintiffs did not appear to "draw 'apple-to-apple' comparisons even when relying on disclosure documents filed by the Plan and its alleged comparators."  *Singh*, 123 F.4th at 95 (alteration in original) (quoting *PBGC*, 712 F.3d at 719-20).  And while Plaintiffs allege that Form 5500 reports are often opaque and do not granularly list all services received, *Singh* and *Boyette* nevertheless require ERISA plaintiffs to allege more

about specific services, their quality, and surrounding context than just pointing to disparities in recordkeeping fees.  *See Singh*, 123 F.4th at 94 (citing *Singh v. Deloitte LLP*, No. 21-cv-08458 (JGK), 2023 WL 4350650, at *4 (S.D.N.Y. July 5, 2023), *aff'd*, 123 F.4th 88).

Finally, Plaintiffs baldly contend that "courts 'around the country' agree with Plaintiffs' arguments," Opp. at 15, but primarily rely on just a single, out-of-circuit case for that proposition: *Mator v. Wesco Distribution, Inc.*, 102 F.4th 172, *see* Opp. at 15-17.  *Mator* is, in any event, distinguishable.  Unlike Plaintiffs' Amended Complaint, "[t]he complaint in *Mator* pled with specificity the recordkeeping services provided by the Wells Fargo plan, as well as the similarity of these services to those provided by lower-priced comparators."  *Singh*, 123 F.4th at 97 (distinguishing *Mator*).  For instance, the *Mator* plaintiffs alleged that the average price per participant for total recordkeeping costs exceeded that of other plans serviced by Wells Fargo, "even though th[o]se other plans received the same services . . . and the same level and quality of service," and likewise exceeded the fees of 11 other plans which "all provided identical or similar services of the same quality."  *Id.* (internal quotation marks omitted).  Relying on service-code data in publicly available Form 5500s, the *Mator* plaintiffs also provided a more granular analysis of the plans' respective services, including observing that comparators listed service codes "exactly match[ing]" the service codes in the plaintiffs' plan, and that there was apparent "overlap" between the plans' services.  *Mator*, 102 F.4th at 186.  For instance, the *Mator* plaintiffs "alleged that when the plan at issue . . . switched recordkeepers in 2020, it 'paid a much lower flat fee . . . per participant' for the same services, delivered at the same level of quality."  *Singh*, 123 F.4th at 97 (second omission in original) (quoting *Mator*, 102 F.4th at 181).  If anything, *Mator* only further underscores the shortcomings in Plaintiffs' Amended Complaint.

For the above-cited reasons, the Court finds that Plaintiffs have not adequately pleaded their excessive fees claim.[10]

## III. Mitsubishi Chemical America and the Board of Directors

Finally, Defendants move to dismiss Mitsubishi Chemical and the Board of Directors as defendants. During the Class Period, the Plan's annual Form 5500 reports identified Mitsubishi Chemical as the sponsor and "Plan Administrator" of the Plan. AC ¶ 12. The Board of Directors was in turn responsible for "appoint[ing] the Administrative Committee of the Plan." *Id.* ¶ 13. Defendants assert that these allegations are not sufficient to assert either a direct breach of fiduciary duty claim, or a derivative claim premised on either a failure to monitor or cofiduciary liability, against Mitsubishi Chemical or the Board of Directors. Br. at 14-16.

As a preliminary matter, Plaintiffs argue that the Defendants have waived any argument with respect to the Board of Directors and Mitsubishi Chemical by failing to raise it in their initial motion to dismiss. Opp. at 21. Plaintiffs, however, misconstrue Defendants' argument as a personal-jurisdiction argument subject to waiver under Rule 12(h). As Defendants clarify, their motion for dismissal against the Board of Directors and Mitsubishi Chemical is brought

---

[10] As for Plaintiffs' citation to NEPC data to argue that "the outside limit of a reasonable administrative fee for the Plan should have been no more than $70 per participant for the Class Period," AC ¶ 52, the Court already rejected Plaintiffs' reliance on NEPC data in *Humphries I*, *see* 2024 WL 4711296, at *9-10. The 2023 NEPC Survey, like the 2021 survey, suggests only that most plans with 1,000 to 5,000 participants paid roughly $40 to $80 per participant in "recordkeeping, trust & custody fee review" in 2023. *NEPC 2022 DC Plan Trends & Fees Survey*, NEPC (2023), https://www.nepc.com/wp-content/uploads/2023/03/2022-NEPC-DC-Plan-Trends-Fees-Survey-Results_Final.pdf [https://perma.cc/3VCM-3RTE]. In *Humphries I*, the Court held that Humphries' reliance on substantially similar NECP data "dr[ew] a false equivalency between recordkeeping costs and administrative fees," because the NEPC's statistic "provides little insight into whether *total* recordkeeping fees . . . paid by smaller-plan participants [were] higher or lower than the *total* recordkeeping fees paid by plaintiff and other Plan participants." 2024 WL 4711296, at *9. Plaintiffs' allegations invoking industry data closely mirror those in the initial Complaint, *compare* AC ¶ 52, *with* Dkt. 1 ¶ 52, and are deficient for the same reasons.

under Rule 12(b)(6) as a motion for failure to state a claim against either Defendant, *see* Reply at 10-11, and is therefore not subject to waiver merely because Defendants did not make the argument in their initial motion to dismiss.

### A. Plaintiffs' Breach of Fiduciary Duty Claim Against Mitsubishi Chemical

The nature of the claims available against Mitsubishi Chemical and the Board of Directors necessarily turns on whether they can be considered fiduciaries to the Plan for purposes of the charged conduct.

"The individual named as the 'administrator' in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the 'sponsor' of the plan is considered the administrator of the plan and thereby the named fiduciary." *In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d 345, 353-54 (S.D.N.Y. 2009) (quoting 29 U.S.C. § 1002(16)(A)). Moreover, in addition to named fiduciaries, "ERISA also defines fiduciaries 'in *functional* terms of control and authority over the plan.'" *Id.* at 354 (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993)). Under ERISA, an individual is a fiduciary of a plan to the extent he or she "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets," or "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). "Congress intended ERISA's definition of fiduciary 'to be broadly construed.'" *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997) (quoting *Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir. 1987)). "Thus, fiduciary status is imposed both on those 'who have actually been granted discretionary authority, regardless of whether such authority is ever exercised' and on 'those who exercise discretionary authority, regardless of whether such authority was ever granted.'" *Humphries I*, 2024 WL 4711296, at *11 (quoting *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 63 (2d Cir. 2006)).

Plaintiffs allege that, according to the company's Form 5500s, Mitsubishi Chemical was listed as Plan Administrator and is therefore a named fiduciary. Plaintiffs also allege that Mitsubishi Chemical, along with the Administrative Committee and the Board of Directors, had "sole authority to amend or terminate, in whole or part, the Plan, and ha[d] discretionary authority to control the operation, management and administration of the Plan." SAC ¶ 14. These allegations suffice to plausibly establish that Mitsubishi Chemical was a fiduciary with respect to the Plan's administration. *See, e.g.*, *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act Litig,* 756 F. Supp. 2d 330, 346 (S.D.N.Y. 2010) ("It is undisputed that the Benefits Committee [was] a Plan fiduciary" where the "Benefits Committee is the administrator and named fiduciary for the Plans" (citing 29 U.S.C. §§ 1002(16)(A), 1102(a)(1))).

### B. Plaintiffs' Breach of Fiduciary Duty Claim Against the Board of Directors

The Board of Directors, however, are another matter. Plaintiffs have not adequately pleaded that the individual Board members are fiduciaries to the Plan for purposes of the conduct alleged. The Board of Directors' fiduciary responsibility with respect to the Plan is a limited one. "The only power the Board had under the Plan was to appoint, retain, or remove members of the Committee. Thus, the Board's fiduciary obligations can extend only as to those acts." *Corning*, 234 F. Supp. 2d 222 (citation omitted); *see also In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d at 356 ("The right to appoint and remove fiduciaries is insufficient to constitute fiduciary status."). Plaintiffs have not adequately pleaded that the Board exercised discretionary authority over investment decisions. Accordingly, there is no basis for proceeding against the individual Board members on a breach of fiduciary duty claim based on a "fail[ure] to investigate the availability of lower-cost share classes of certain mutual funds." AC ¶ 61.

Nor can Plaintiffs proceed based on a theory that the Board failed to adequately monitor appointees to the Advisory Committee — the Amended Complaint contains no allegations to that

effect.  To be sure, a "duty to monitor, although not explicitly imposed by statute, flows from the other duties set out in Section 1104(a) and require[s] those fiduciaries with the power to appoint and remove plan fiduciaries to monitor the performance of those appointees."  *Antoine*, 2023 WL 6386005, at *11 (alteration in original) (quoting *Patterson*, 2019 WL 4934834, at *7).  But the duty to monitor "does not make the appointing fiduciary responsible for every substantive investment or management decision of the appointee."  *Ruilova v. Yale-New Haven Hosp., Inc.*, No. 22-cv-00111 (MPS), 2023 WL 2301962, at *20 (D. Conn. Mar. 1, 2023).  Here, the Amended Complaint is devoid of any allegations suggesting that individual members of the Board failed to adequately monitor the Advisory Committee, apprise them of adverse information, or otherwise appropriately manage the Committee.  The Amended Complaint makes only the conclusory assertion, relying on group pleading, that "Defendants . . . failed to delegate [their] duties prudently, including failing to have a credible basis to conclude that the investment professionals responsible for carrying out [their] investment strategy were competent to do so successfully, and failing to appropriately monitor and supervise their performance."  AC ¶ 61.  Plaintiffs' cursory contention, premised on group pleading, does not suffice.

Finally, Plaintiffs also have not adequately pleaded cofiduciary liability against the Board of Directors.  As noted above, the Board of Directors is a fiduciary to the Plan (even if its fiduciary responsibilities are limited).  Again speaking in terms of "Defendants" generally, the Amended Complaint alleges that "Defendants knowingly participated in each fiduciary breach of the other Plan fiduciaries, knowing that such acts were a breach, and enabled the other Plan fiduciaries to commit fiduciary breaches by failing to lawfully discharge their own duties."  AC ¶ 62.  Plaintiffs merely track the statutory language for cofiduciary liability but plead no allegations to support that individual Board members knew of the other Defendants' alleged

breach of their fiduciary duties, or that they enabled the other Defendants to commit a breach of their fiduciary duties. The Court has no obligation to weigh "conclusory allegations, such as 'formulaic recitations of the elements of a cause of action.'" *Sacerdote*, 9 F.4th at 107 (alterations adopted) (quoting *Twombly*, 550 U.S. at 555) (citing *Iqbal*, 556 U.S. at 678).[11]

For the foregoing reasons, the Court finds that Plaintiffs have not adequately pleaded a claim against the individual members of the Board of Directors and that the Board of Directors should therefore be dismissed from this case with prejudice.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is DENIED in part and GRANTED in part. Plaintiffs' excessive fees claim is dismissed with prejudice. Plaintiffs' claims as to the Board of Directors are dismissed with prejudice. However, Defendants' motion to dismiss is denied with respect to Plaintiffs' share class claim.

The Clerk of Court is respectfully directed to terminate the motion at Dkt. 59.

Dated: August 19, 2025
     New York, New York

SO ORDERED.

*Jennifer Rochon*

JENNIFER L. ROCHON
United States District Judge

---

[11] The Court acknowledges that some courts have held that conclusory assertions of knowledge akin to those here suffice to plead cofiduciary liability at the motion to dismiss stage. However, those cases predate *Iqbal* and *Twombly* and therefore do not govern this Court's analysis. *See, e.g.*, *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 480 (S.D.N.Y. 2005) (holding that the "complaint closely tracks the statutory language" for cofiduciary liability, "which is sufficient" to state a cofiduciary liability claim).